# RECORD IMPOUNDED

### NOT FOR PUBLICATION WITHOUT THE
### APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0398-18T3

J.M.,

     Plaintiff-Respondent,

v.

E.R.,

     Defendant-Appellant.

_____

     Submitted November 4, 2019 – Decided January 9, 2020

     Before Judges Messano and Susswein.

     On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FV-09-0178-19.

     Adam W. Toraya, attorney for appellant.

     Respondent has not filed a brief.

PER CURIAM

     Defendant, E.R., appeals from a final restraining order (FRO) entered against him pursuant to the Prevention of Domestic Violence Act (PDVA),

N.J.S.A. 2C:25-17 to -33. After a plenary hearing, the trial court found that defendant had violated a temporary domestic violence restraining order (TRO) by contacting the victim, J.M., in an effort to convince her to dismiss the TRO and resume their dating relationship. Defendant on appeal does not dispute that his violation of the no-contact condition of the TRO constitutes a predicate act of domestic violence but argues that an FRO was not needed to protect the victim from further abuse. We have reviewed the record in view of the applicable legal principles and deferential standard of appellate review and conclude that the trial court properly considered all of the relevant facts and circumstances, including those that defendant argues militate against an FRO. We therefore affirm entry of the FRO.

I.

Defendant raises the following argument for our consideration:

THE COURT ERRED IN GRANTING A FINAL RESTRAINING ORDER WITHOUT PROPERLY CONSIDERING THE SIX NON-EXCLUSIVE CRITERIA SET FORTH IN N.J.S.A. 2C:25-29(a).

We begin our consideration of defendant's argument by acknowledging the legal principles governing this appeal. Our review of a domestic violence order is limited. We must accept findings by the trial court that are "supported

A-0398-18T3

by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998) (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Ibid. (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). Deference is also particularly warranted "[b]ecause of the family courts' special jurisdiction and expertise in family matters." Id. at 413. Accordingly, "an appellate court should not disturb the 'factual findings and legal conclusions of the trial judge unless [it is] convinced they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Id. at 412 (alteration in original) (quoting Rova Farms Resort, Inc., 65 N.J. at 484).

In Silver v. Silver, we summarized the two-step analysis courts must apply in determining whether to grant an FRO under the PDVA. 387 N.J. Super. 112 (App. Div. 2006). "First, the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. In this instance, defendant does not contest the trial court's finding that he

A-0398-18T3

committed a predicate act of domestic violence by violating the no-contact provision of the TRO. N.J.S.A. 2C:25-19(a)(17).

"The second inquiry, upon a finding of the commission of a predicate act of domestic violence, is whether the court should enter a restraining order that provides protection for the victim." Silver, 387 N.J. Super. at 126. "The second prong set forth in Silver requires the conduct must [be] imbued by a desire to abuse or control the victim." R.G. v. R.G., 449 N.J. Super. 208, 228 (App. Div. 2017) (citing Silver, 387 N.J. Super. at 126–27); see also Peranio v. Peranio, 280 N.J. Super. 47, 52 (App. Div. 1995) (defining domestic violence as "a pattern of abusive and controlling behavior injurious to its victims"). Whether a defendant's conduct was designed to abuse or control the plaintiff should be assessed in the context of the "entire relationship between the parties." Cesare, 154 N.J. at 395.

"Although this second determination . . . is most often perfunctory and self-evident," Silver, 387 N.J. Super. at 127, it is clear that a need for an FRO should not flow automatically from the finding of a predicate act of domestic violence. Id. at 126–27 (citing Kamen v. Egan, 322 N.J. Super. 222, 227 (App. Div. 1999)). "[T]he guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to (6), to

A-0398-18T3

protect the victim from an immediate danger or to prevent further abuse." Id. at 127. The six factors include: (1) the previous history of domestic violence between the parties; (2) "the existence of immediate danger to person or property;" (3) the financial circumstances of the parties; (4) the best interests of the victim; (5) the protection of the victim's safety in relation to custody and parenting time; and (6) the existence of a restraining order in a different jurisdiction. N.J.S.A. 2C:25-29(a)(1) to (6). The court may also look to other relevant factors not included in the statute. N.J.S.A. 2C:25-29(a) ("The court shall consider but not be limited to the following factors . . . ."); N.T.B. v. D.D.B., 442 N.J. Super. 205, 223 (App. Div. 2015) (noting the statutory factors are "nonexclusive").

## II.

In order to apply these governing legal principles here, we recount the evidence adduced before the trial judge. The plenary hearing consisted of J.M.'s testimony and exhibits of text messages defendant sent and records of phone calls defendant made, violating the TRO. Defendant and J.M. began their ill-fated dating relationship in March 2018. Sometime in late June, J.M. broke up with defendant. Defendant did not react well. Defendant's best friend told J.M. that he was worried about defendant's safety, prompting J.M. to invite defendant

A-0398-18T3

to the apartment she shared with her mother. Defendant arrived nervous and trembling, asking J.M. to hug him. The two spent the night together at the apartment. The following morning, J.M. told defendant once again that their romantic relationship was over. That prompted a course of alarming behavior. J.M.'s mother was present in the apartment throughout the drama that unfolded.

Defendant told J.M. that he would end his life if she ended the relationship. Defendant exited the apartment through a window onto the fire escape and threatened to jump, telling J.M., "I'm going to end my life. I don't want to live if I'm not with you."

Defendant eventually came back inside the apartment. He told J.M. he had a "good idea," and that he now intended to leave on his motorcycle. J.M. was concerned because defendant had told her the night before that he rode the motorcycle the wrong way on a street into incoming traffic, and he told her that he previously tried to end his life. Defendant took his helmet and left the apartment.

From the street below the apartment, defendant texted J.M. explaining that he had left the keys for his motorcycle in the apartment. He asked her to drop the keys to the street. J.M. hid the keys instead. J.M. then called defendant's mother. She told J.M. that to calm him down, she should tell defendant they

A-0398-18T3

would remain in a dating relationship, but J.M. did not want to mislead defendant into believing they would stay together. By this point, defendant had returned to J.M.'s apartment in an effort to find the keys with an app on his smartphone. To prevent E.R. from locating the keys, J.M. took his phone and gave it to her mother for safekeeping.

On the advice of defendant's mother, J.M. poured water on defendant's head. Defendant calmed down for a while and laid down on J.M.'s bed. Defendant stayed in J.M.'s bedroom for roughly twenty minutes, left the bedroom, became anxious once again, and then went to the bathroom, locking the door behind him. J.M. heard defendant groan in pain, suggesting to her that he had hurt himself. Plaintiff retreated to her mother's bedroom, locked the door, and called the police. Plaintiff's mother remained in the kitchen.

Defendant left the bathroom and broke through the locked door to the mother's bedroom. Defendant was bleeding from his abdomen as a result of a self-inflicted wound. Defendant displayed the injury to J.M., told her it was too late, and left the apartment.

Plaintiff explained these disturbing events to the police officers who responded to the call for assistance. The officers told her to remain in her

apartment while they searched for defendant. About thirty minutes after the police left, defendant reappeared, knocking on J.M.'s door.

Defendant asked J.M. to let him into the apartment so he could rest and recover from his stomach wound. J.M. told him she was too scared to let him in, and that he should rest outside her door while she called an ambulance. Plaintiff called for the ambulance while she waited by the front door of the apartment. Plaintiff's mother went to the window and checked outside the building. She saw defendant climbing the fire escape.

Plaintiff and her mother left the apartment and went downstairs. Defendant gained entry to the apartment through the fire-escape window and then followed them downstairs. Defendant left the area before the police returned.

Based on these events, J.M. obtained a domestic violence TRO against defendant alleging the predicate act of harassment. N.J.S.A. 2C:25-19(a)(13). The day after the TRO was issued, and despite a no-contact order, defendant called J.M. She decided not to answer the phone. A week later, defendant called again. When J.M. failed to answer the call, defendant sent the following text message:

> [J.M.], I am sorry for what I have done. You are an
> amazing person. I am not perfect. And, I remember

> you said that I am perfect when I bought you flowers. I told you I will make mistakes (indiscernible) and I hope you forgive me. I will do my best to win your heart even if I get hurt I will accept it. All I want is to love you. I'm trying.

Plaintiff did not respond to the text.

J.M. also was contacted by others acting on defendant's behalf, urging her to dismiss the domestic violence complaint. Defendant's brother-in-law texted J.M. on July 16, 2018. Defendant's mother texted J.M. on July 29, 2018, and again sometime in August. Defendant's mother called J.M. on July 26, 2018, and again on July 29, 2018.

The FRO hearing was initially scheduled to be heard on August 2, 2018. Outside of the courtroom, defendant confronted J.M. and asked her to drop the domestic violence complaint, telling her that "[she] was going to ruin his life and he – if [she] continue[d] he could go to jail for like six months." J.M. told him she intended to proceed with her application for an FRO. J.M.'s mother interceded and ended the conversation.

In response to these violations of the no-contact conditions of the initial TRO, J.M. obtained an amended TRO alleging contempt as a predicate act of domestic violence in addition to harassment. The plenary hearing on the amended complaint was finally heard on September 5, 2018.

After hearing the evidence, the judge found that defendant violated the PDVA and issued an FRO. The court aptly characterized defendant's behavior in J.M.'s apartment as disturbing and manipulative. Even so, the court found that J.M. had failed to prove that defendant's threat to commit suicide and self-mutilation behavior constituted the predicate offense of harassment, concluding that defendant did not harbor the requisite intent to harass J.M.[1] See Hoffman, 149 N.J. at 577 (holding that a finding of a purpose to harass is necessary for a conviction for this offense (citing E.K. v. G.K., 241 N.J. Super. 567, 570 (App. Div. 1990))).

The court did find, however, that the repeated violations of the no-contact provision of the TRO constituted contempt—a predicate offense under the PDVA alleged in the amended TRO. N.J.S.A. 2C:25-19(a)(17). There is ample credible evidence to support the trial court's conclusion that defendant committed multiple acts of contempt of the TRO, and as we have noted, defendant does not dispute this finding on appeal. Accordingly, the first part of the two-part Silver test was clearly established.

---

[1] J.M. does not cross-appeal this finding.

The trial court next carefully assessed whether J.M. established the second prong of the <u>Silver</u> test for issuance of an FRO, that is, the need for an FRO to protect the victim of domestic violence. In deciding that J.M. needed an FRO, the court relied heavily on defendant's inability to let go of his relationship with her. We agree that in the particular circumstances of this case, and especially in view of defendant's emotional instability and penchant for extreme behavior, his persistent denial of the termination of the dating relationship is an especially significant circumstance, one that presages future attempts to resurrect the relationship.

Although the court did not find that defendant posed a risk of physical harm to J.M., the court did find that defendant lacks control of his emotions and was unwilling to abide by the restrictions placed upon him by the TRO. These circumstances, the trial court concluded, necessitate an FRO to prevent further abuse. As we explained in <u>Silver</u>, the need for an FRO depends upon whether the FRO is required to "protect the victim from an immediate danger <u>or to prevent further abuse</u>." 387 N.J. Super. at 127 (emphasis added). In other words, while immediate danger is a common basis for issuing an FRO, such danger is not an absolute prerequisite. The PDVA also protects domestic

A-0398-18T3

violence victims from further abuse, that is, a repetition of the conduct constituting the predicate act of domestic violence.

Contrary to defendant's contention, the trial court did not rely solely on defendant's contempt of the TRO in reaching its conclusion that an FRO was needed in this case. The judge properly considered the totality of the evidence presented at the hearing, including, notably, the incident in which defendant threatened suicide and injured himself to gain J.M.'s attention and sympathy. Although the judge did not find this behavior to constitute a predicate act of harassment, he did take this incident into account in addressing the second Silver prong, explicitly stating in his ruling that, "[I]'m going to consider your actions on July 11th when I have to go to the next step here; whether there's a need for the restraining order under Silver versus Silver."

The record clearly shows, moreover, that the trial court considered and properly accounted for the circumstances cited by defendant that militate against issuance of an FRO, including the absence of physical violence directed against the victim, the absence of any threat of such violence, and the absence of a past history of domestic violence. See A.M.C. v. P.B., 447 N.J. Super. 402, 414 (App. Div. 2016) ("Thus, courts may consider two key factors when determining whether to issue permanent restraints: (1) a lack of evidence demonstrating a

12

history of domestic violence or abuse; and (2) the commission of a predicate act that does not involve physical violence against the victim.").

The trial court in the exercise of its discretion weighed all of the relevant factors militating for and against an FRO and concluded ultimately that the predicate acts of contempt, viewed in context with defendant's emotional instability, lack of control, and refusal to accept the termination of the relationship, created a risk of further abuse warranting the protection of an FRO. See Silver, 387 N.J. Super. at 127–28 (recognizing the need to prevent further abuse as a basis for issuing an FRO); see also Cesare, 154 N.J. at 405 ("[T]rial courts must weigh the entire relationship between the parties . . . .").

We see no reason to disturb the trial court's assessment of the relevant factors. We add that the trial court's analysis placed appropriate weight on the fourth Silver factor—the best interests of the victim. N.J.S.A. 2C:25-29(a)(4).

We further note that the trial court's finding that defendant attempted to manipulate J.M. into remaining in a relationship with him represents an all-too-common form of domestic abuse that the PDVA is designed to address. See R.G., 449 N.J. Super. at 228 (explaining an FRO is warranted when a defendant's conduct is "imbued by a desire to abuse or control the victim" (emphasis added) (citing Silver, 387 N.J. Super. at 126–27)). In this instance, defendant used the

threat of suicide to present J.M. with the choice of ending her relationship with defendant or being responsible for his death. Such tactics to achieve emotional control, accomplished in this instance by physical acts and not just idle words, go far beyond the boundaries of mere "domestic contretemps." Cf. Kamen v. Egan, 322 N.J. Super. 222, 228 (App. Div. 1999) (holding that trial court erred in issuing FRO based on a single act of trespass unaccompanied by violence or threat of violence).

Given defendant's extreme behavior, the trial court correctly recognized that there was a significant risk that J.M. would be subjected to future contact by defendant and repeated episodes of disturbing, manipulative behavior. While an FRO may prove to be no more effective at deterring future abuse than the TRO that defendant has already violated, its issuance was legally and factually appropriate, consonant with the laudatory objectives of the PDVA.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0398-18T3