**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3623-18T1

E.H.,

    Plaintiff-Respondent,

v.

K.H.,

    Defendant-Appellant.

_____

Argued telephonically July 14, 2020 –
Decided September 9, 2020

Before Judges Sabatino and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FV-03-1156-19.

Hanan M. Isaacs argued the cause for appellant (Kingston Law Group, attorneys; Hanan M. Isaacs, on the briefs).

E.H., respondent, argued the cause pro se (Megha R. Thakkar, on the brief).[1]

PER CURIAM

_____

[1] Respondent's counsel withdrew after the briefs were filed.

Defendant, K.H., appeals from the March 15, 2019 final restraining order (FRO) entered against him pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35.[2] The trial court found defendant harassed his estranged wife, plaintiff (E.H.), when he mailed his answer and counterclaim (referred to jointly as counterclaim) in their divorce action to several of plaintiff's coworkers, the wife of one of the coworkers, and to plaintiff's father. The counterclaim contained graphic and scandalous allegations about plaintiff.

Defendant does not dispute he disseminated copies of the counterclaim anonymously to persons who had no role in the divorce litigation. He contends he was acting as a "whistleblower" and that he did not have a purpose to harass as required by N.J.S.A. 2C:33-4. He further argues the trial court's ruling impinged upon his rights of free speech. He also contends the trial court erred in finding that an FRO is needed to prevent future domestic violence because there was no proof that he would commit physical violence against plaintiff.

After carefully reviewing the record in view of the applicable legal principles, we vacate the FRO and remand for the trial court to make additional

---

[2] In accordance with Rule 1:38-3(d)(9), and to protect the privacy of the parties, we use initials to refer to the defendant and plaintiff in this domestic violence matter.

findings of fact and law with respect to the various predicate acts of domestic violence that were alleged in plaintiff's temporary restraining order (TRO). The trial court made findings only with respect to the anonymous dissemination of the counterclaim. The trial court, moreover, did not clearly indicate which specific type(s) of harassment under N.J.S.A. 2C:33-4 the court found that defendant had committed. To the extent the trial court may have relied on the type of harassment defined in N.J.S.A. 2C:33-4(c), the court did not make findings with respect to material elements of that offense that were added in State v. Burkert, 231 N.J. 257 (2017), to conform the statute with constitutional requirements.

We therefore remand for the trial court to clarify its decision and also to make factual findings and conclusions of law with respect to other conduct plaintiff alleged to constitute harassment. We also remand for the trial court to make findings concerning the alleged predicate acts of stalking and criminal coercion.

I.

We presume the parties are familiar with the marital discord leading to this appeal. We therefore only briefly summarize the procedural history of this matter and pertinent testimony adduced at the FRO hearing. In October 2018,

3

after six years of marriage, plaintiff filed for divorce citing irreconcilable differences. The parties had a tumultuous relationship during their marriage and the divorce litigation was embittered. In November 2018, plaintiff obtained a TRO against defendant alleging he had (1) punched walls; (2) yelled and screamed at plaintiff and threatened to take their son away; (3) called plaintiff names, including "whore," and told her she was a "bad mom" who would "never make partner or succeed in her career because she is a whore"; and (4) threatened to call plaintiff's job and her family "and [tell] them who she really is." In December 2018, plaintiff agreed to dismiss that initial TRO complaint and the parties entered into a consent order for civil restraints.

In January 2019, defendant filed his answer and counterclaim in the divorce action. Defendant alleged in the counterclaim that plaintiff committed adultery with three individuals: (1) an employee at plaintiff's workplace; (2) a married individual who supervised plaintiff; and (3) a colleague in plaintiff's industry. Defendant claimed that plaintiff used the workplace affairs to advance professionally and to receive positive annual reviews. He also alleged that plaintiff misappropriated company funds to facilitate the affair with her supervisor. Defendant further claimed that plaintiff was guilty of extreme cruelty towards him by various means, including by sending and receiving

A-3623-18T1

sexually explicit texts, pictures, and social media messages with the individuals she allegedly was having affairs with.

Defendant anonymously mailed five copies of the counterclaim to (1) the managing partner of the company for whom plaintiff works; (2) the Chief Operating Officer (COO) of the company; (3) the partner to whom plaintiff directly reported; (4) the wife of the supervisor she allegedly was having an affair with; and (5) plaintiff's parents. After learning that defendant had distributed copies of the counterclaim to these individuals, plaintiff obtained a second TRO alleging harassment. The TRO complaint was later amended without objection to also allege stalking, N.J.S.A. 2C:12-10, and criminal coercion, N.J.S.A. 2C:13-5.

The Family Part judge heard testimony over the course of three FRO hearing dates in January, February, and March 2019. Plaintiff testified that defendant "made threats . . . that he would . . . destroy[] [her] family, destroy[] [her] workplace, destroy[] [her] reputation," and he "stole property out of the home" in violation of the civil restraints. Plaintiff described how defendant's actions threatened her career.

Plaintiff also described defendant's behavior she deemed to be irrational, including the destruction of a sign in the home. Plaintiff also described an

incident in which defendant verbally attacked her, refused to leave, threatened to call her family, and tried to prevent her from leaving the home. She eventually broke free and drove to her parent's home, but defendant continued repeatedly to attempt to contact her.

Plaintiff testified as to several video doorbell camera recordings. Plaintiff offered to play two videos that showed defendant urinating on plants and displaying both middle fingers to the doorbell camera. Defendant did not dispute that he had engaged in that conduct and, for that reason, the trial court declined to view those recordings. The court did, however, view another doorbell camera recording that showed defendant following plaintiff out of the house and screaming and cursing at her.

Plaintiff also testified that defendant followed her in his car, looked up her phone calls in their Verizon account, and punched walls and pillows. She testified that defendant tampered with the home's doorbell camera, despite language in the civil restraints preventing such conduct. Plaintiff claimed that defendant stalked her by means of the doorbell camera system.

Defendant testified and denied harassing or stalking plaintiff. He admitted he damaged a sign when he learned about plaintiff's alleged affairs but denied verbally harassing plaintiff. He also presented his interpretation of what

6

was shown in the doorbell camera video that was viewed by the court, denying that he had grabbed plaintiff's wrist or prevented her from leaving the home. Defendant admitted he had urinated on plaintiff's plants and displayed his middle fingers to the doorbell camera but denied that conduct was meant to harass plaintiff. Defendant also denied behaving irrationally after civil restraints were entered.

Defendant admitted he anonymously mailed copies of the counterclaim to plaintiff's coworkers, but defended that decision claiming they "really needed to know [plaintiff's] lies, what she's been doing . . . to her company in the workplace." Defendant described himself as a whistle-blower.

Defendant also admitted to sending the counterclaim to the wife of one of the coworkers with whom plaintiff was allegedly having an affair. Defendant claimed she "had a right to know." Finally, defendant admitted to sending a copy of the counterclaim to plaintiff's parents. Defendant testified he had a good relationship with plaintiff's father and wanted him to know about plaintiff's alleged lies.

Defendant admitted on cross examination he knew that mailing the counterclaim would likely upset plaintiff. He further acknowledged he knew

that she could be fired as a result of his disseminating the counterclaim to her coworkers.

## II.

We turn next to the trial court's ruling rendered immediately after the attorneys' closing arguments at the FRO hearing. The court in its oral decision acknowledged that the TRO complaint alleged predicates acts of harassment, criminal coercion, and stalking. The court made specific findings, however, only with respect the harassment allegation, explaining:

> As counsel is aware, essentially only one of those [predicate acts] needs to [be] proven. It's not necessary to prove by a preponderance each and every allegation as to the boxes that are checked on the restraining order.
>
> So, for purposes of this finding[], the Court will focus on the harassment aspect.

With respect to that harassment aspect, the court focused on defendant's action of mailing the counterclaim to persons who were not involved in the divorce litigation. The court mentioned some of the other alleged acts of harassment only in terms of their bearing on whether defendant had a purpose to harass. The court explained:

> [P]erhaps if you took any of those individual allegations in a vacuum singularly, the Court would be skeptical that it could conclude that there was a purpose

> to harass someone on any one of those single events viewed in a vacuum.
>
> Now, when you add up the quantity of the events, [it] does not mean just because there's multiple allegations that that automatically means there's a purpose to harass? Not automatically. Is it indicative of a purpose to harass? Perhaps.

The judge further noted with respect to the other acts of harassment alleged in the TRO complaint:

> The Court, if it was limited to just those incidents, probably could make a conclusion that those allegations are more in line with marital contretemps than actually criminal behavior, but there's one big exception and that's the moment that [defendant] decided to send copies of the answer and counterclaim to people that were not direct parties in this litigation.

So far as the record before us shows, the court never ruled definitively on whether any or all of those other alleged acts of harassment were actually committed and if so, whether they constitute predicate acts of domestic or were, as the court intimated, mere domestic contretemps not rising to the level of domestic violence harassment. See Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006) (explaining the PDVA was meant to address "matters of consequence" and distinguishing those from contretemps); Peranio v. Peraino, 280 N.J. Super. 47, 55–57 (App. Div. 1995) (looking to the requirements for harassment and concluding the conduct at issue was domestic contretemps).

The trial court did, however, make explicit witness credibility findings. Specifically, the court found plaintiff's testimony was credible despite minor discrepancies exposed on cross examination. In stark contrast, the court found that defendant was "absolutely not credible," and that his asserted reasons for mailing the counterclaim did not make sense. The court rejected, for example, defendant's explanation that he distributed the counterclaim as a "truth seeker." The court found instead that defendant distributed the counterclaim "because he's angry and he wanted to send a message to [] plaintiff."

The court also rejected defense counsel's argument that defendant had not harassed plaintiff because she had not been fired. The court noted defendant "knew when he sent that information to those people that there was a risk that she was going to lose her job or something negative could happen to her." The court also rejected defendant's explanation for why he sent the answer to plaintiff's parents and to the coworker's wife.

Based on those factual and credibility findings, the court concluded there was "no justification for [] defendant's choice to send those documents other than to harass [] plaintiff." The court thereupon found plaintiff met her burden of establishing a predicate act of domestic violence by a preponderance of the evidence.

 A-3623-18T1

The court next considered whether an FRO should be entered. The court found defendant "by his own testimony and his demeanor on the stand" established "there's very much a legitimate and reasonable fear of future acts of domestic violence." Specifically, the court found "defendant clearly has not gotten over the fact his wife has cheated on him" and concluded that "until [defendant] starts to get a better hold of his emotions[,] . . . there is a legitimate and reasonable fear of future acts of domestic violence." The court thereupon issued an FRO against defendant, fined him $100, and ordered him to attend a batterers' intervention program.

## III.

Defendant contends his mailing of the counterclaim did not constitute the predicate act of harassment. Specifically, defendant argues he did not (1) publish anything to plaintiff; (2) make any communications to plaintiff at inconvenient hours; (3) communicate with plaintiff in offensively coarse language; (4) subject plaintiff to striking, kicking, shoving, or other offensive touching, or threaten to do so; or (5) engage in any other course of alarming conduct or repeatedly commit acts with purpose to alarm or seriously annoy.

A-3623-18T1

IV.

We begin our analysis by acknowledging the legal principles governing this appeal. The scope of our review is limited. We must accept findings by the trial court that are "supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998) (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Ibid. (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). Deference is also particularly warranted "[b]ecause of the family courts' special jurisdiction and expertise in family matters." Id. at 413. Accordingly, "an appellate court should not disturb the 'factual findings and legal conclusions of the trial judge unless [it is] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Id. at 412 (alteration in original) (quoting Rova Farms Resort, Inc., 65 N.J. at 484).

When determining whether to grant an FRO under the PDVA, the trial court must engage in a two-step analysis. Silver, 387 N.J. Super. at 125–26. "First, the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts

12

set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125; see also N.J.S.A. 2C:25-29(a) (providing that an FRO may only be granted "after a finding or an admission is made that an act of domestic violence was committed"). "The second inquiry, upon a finding of the commission of a predicate act of domestic violence, is whether the court should enter a restraining order that provides protection for the victim." Silver, 387 N.J. Super. at 126.

To establish that a predicate act of domestic violence was committed, a plaintiff must prove all the elements, including but not limited to the requisite mental culpability state, N.J.S.A. 2C:2-2(a), of at least one of the offenses enumerated in N.J.S.A. 2C:25-19(a). The PDVA is codified as a chapter in Title 2C, the New Jersey Code of Criminal Justice (Code). The definition of the term "domestic violence" set forth in N.J.S.A. 2C:25-19(a) lists nineteen offenses that are defined elsewhere in the Code. The PDVA incorporates by reference not just the name of these nineteen offenses but also their material elements. See N.J.S.A. 2C:1-14(h) (defining the term "element of an offense").

We hold this basic principle of incorporation by reference in N.J.S.A. 2C:25-19(a) applies whether the elements of a listed offense are written by the Legislature, as per usual, or are modified by the Supreme Court to conform an otherwise vague or overbroad statute to satisfy constitutional requirements, as

occurred in State v. Hoffman, 149 N.J. 564, 583 (1997) (narrowing the breadth of catchall language in N.J.S.A. 2C:33-4(a) to avoid constitutional infirmity), and more recently in Burkert, 231 N.J. at 263–64.

By the same token, precedential criminal cases that construe the elements of a listed offense apply not only in criminal prosecutions but also when that offense is alleged to have been committed as a predicate act of domestic violence. See, e.g., Cesare, 154 N.J. at 404 (applying the constitutionally compelled narrowing construction announced in Hoffman, a criminal case, to a civil domestic violence case). In a criminal prosecution, of course, the material elements of the charged offense must be proved by the State beyond a reasonable doubt. See N.J.S.A. 2C:1-13(a) ("No person may be convicted of an offense unless each element of such offense is proved beyond a reasonable doubt." (emphasis added)). In a domestic violence FRO hearing, those same material elements must be proved by the plaintiff applying the lower preponderance of the evidence standard. N.J.S.A. 2C:25-29(a) ("At the [FRO] hearing the standard for proving the allegations in the complaint shall be by a preponderance of the evidence.").

## V.

We next address defendant's contention the trial court erred in ruling that plaintiff proved by a preponderance of the evidence that defendant committed the predicate act of harassment as defined in N.J.S.A. 2C:33-4.[3] The harassment statute consists of several sections that specify different ways of committing the offense. Each section thus prescribes a different set of material elements that must be proved.[4]

---

[3] The statute provides a person commits the offense of harassment "if, with purpose to harass another," he or she:

> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
>
> [N.J.S.A. 2C:33-4.]

[4] All of the distinct variations of harassment share a common mental culpability state, that is, that the person acted "with purpose to harass another." Thus, to find harassment, there must be proof that a defendant's conscious object was to "harass[,]" that is, "'annoy'; [sic] 'torment'; [sic] 'wear out'; [sic] and 'exhaust.'" State v. Castagna, 387 N.J. Super. 598, 607 (App. Div. 2006) (quoting Webster's

Despite ruling that defendant harassed plaintiff by disseminating copies of the counterclaim to others, the court in its oral decision did not indicate specifically which section(s) of N.J.S.A. 2C:33-4 defendant violated. Although we generally give substantial deference to a Family Part judge's finding, N.J. Div. of Youth and Family Servs. v. R.G., 217 N.J. 527, 553 (2014), we can only do so when the court's findings are sufficiently specific to allow for meaningful review. We note plaintiff's testimony might implicate a "course of alarming conduct" under N.J.S.A. 2C:33-4(c) but also describes communications made "anonymously" that might conceivably fall within the purview of N.J.S.A. 2C:33-4(a). Because we cannot be certain which provision or provisions of the harassment statute the court applied, it is necessary to remand the case for the trial court to make more detailed findings with respect to the material elements of the section or sections of N.J.S.A. 2C:33-4 the court relied on.

The need for clarification of the trial court's ruling is underscored by the Supreme Court's decision in Burkert. The Court redefined the elements of the variation of the harassment offense set forth in N.J.S.A. 2C:33-4(c) to save that

---

II New College Dictionary 504 (1995)); see also J.D. v. M.D.F., 207 N.J. 458, 487 (2011) (stating that, to find a party acted with purpose to harass, there must be "some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient" (citing State v. Fuchs, 230 N.J. Super. 420, 428 (App. Div. 1989))).

A-3623-18T1

section from constitutional vagueness and overbreadth infirmities. Burkert, 231 N.J. at 284–85. In that case, the defendant retaliated against a fellow corrections officer and rival union official, Halton, by posting on social media Halton's wedding photos onto which Burkert added lewd dialogue in speech bubbles over the faces of the bride and groom. Id. at 267. This was done in retaliation for derogatory comments about Burkert that had been posted on social media by Halton's wife. Ibid. While characterizing the comments superimposed on the wedding photos as "boorish, crude, utterly unprofessional, and hurtful," id. at 286, the Court recognized that defendant's conduct was expressive activity, ibid.

The Court concluded that N.J.S.A. 2C:33-4(c) as written by the Legislature was impermissibly vague and overbroad. Id. at 280. Rather than strike the statute, the Court instead construed it to remediate its constitutional infirmities, holding that "in cases based on pure expressive activity, the amorphous terms 'alarming conduct' and 'acts with purpose to alarm or seriously annoy' must be defined in more concrete terms consonant with the dictates of the free-speech clauses of our Federal and State Constitutions." Id. at 284. The Court further explained:

> Narrowly reading the terms alarm and annoy . . . will save the statute from constitutional infirmity. . . .

Therefore, for constitutional reasons, we will construe the terms "any other course of alarming conduct" and "acts with purpose to alarm or seriously annoy" as repeated communications directed at a person that reasonably put that person in fear for his safety or security or that intolerably interfere with that person's reasonable expectation of privacy.

[Id. at 284–85 (emphasis added).]

To the extent the trial court in this case may have relied on N.J.S.A. 2C:33-4(c) to support its conclusion that defendant harassed plaintiff by disseminating copies of the counterclaim, the court on remand must determine whether plaintiff proved the additional elements of that offense as it was construed in Burkert.

We recognize that in Burkert, the Court on its own initiative reversed the harassment conviction "because even the most indulgent view of the record favoring the State would not support a harassment conviction under N.J.S.A. 2C:33-4(c)." Id. at 285. The Court nonetheless recognized that "in other circumstances a remand might be appropriate." Ibid. We believe the case before us presents such "other circumstances." For one thing, it is not certain the trial court even relied on N.J.S.A. 2C:33-4(c) to conclude that defendant committed a predicate act of domestic violence. Moreover, the decision whether the additional elements were proven in this case may not be as clear-cut as the

circumstances presented in <u>Burkert</u> and therefore should be made in the first instance by the trial court. Affording the trial judge the opportunity to make more specific findings of both fact and law seems especially appropriate considering that a remand for further factual and legal findings is necessary in any event to address other allegations of stalking and criminal coercion that were not resolved in the trial court's oral decision.

In these circumstances, we choose not to exercise original jurisdiction in determining whether plaintiff proved that defendant committed a violation of N.J.S.A. 2C:33-4(c). <u>See</u> <u>State v. Micelli</u>, 215 N.J. 284, 293 (2013) (noting that <u>Rule</u> 2:10-5 "allow[s] [an] appellate court to exercise original jurisdiction to eliminate unnecessary further litigation but discourage[es] [sic] its use if factfinding is involved" (first, second. and third alterations in original) (quoting <u>State v. Santos</u>, 210 N.J. 129, 142 (2012))). We note, however, the multiple mailings at issue in this case were addressed to other persons, not to plaintiff. The evidence nonetheless reasonably suggests defendant knew and intended that plaintiff would learn of those communications and would feel their impact. We therefore leave it to the trial court to determine in the first instance whether, considering the proofs of defendant's intent, those mailings were essentially "directed at" plaintiff within the meaning of the additional elements

superimposed on N.J.S.A. 2C:33-4(c) in <u>Burkert</u>. We note in this regard the trial court has already found that defendant disseminated the counterclaim because "he wanted to send a message to [] plaintiff."

## VI.

In determining that defendant harassed plaintiff, the trial court focused on the anonymous dissemination of the counterclaim to persons who were not involved in the divorce litigation. The court in its oral decision did not specifically address the other acts of harassment alleged in the TRO complaint and described in testimony at the FRO hearing except to note that any one of them viewed in isolation might not establish the purpose to harass required for all variations of the harassment offense. <u>See</u> <u>supra</u> note 4. Although the trial court alluded to domestic contretemps, it did not specifically rule on whether the other alleged acts constitute harassment under any of the variations of 2C:33-4. Accordingly, on remand, the court shall determine whether plaintiff proved by a preponderance of the evidence that defendant committed harassment by acts other than by disseminating copies of the counterclaim.[5]

---

[5] We note that even if the court on remand finds that defendant did not commit a violation of N.J.S.A. 2C:33-4(c) as construed in <u>Burkert</u>, and even if the court finds the acts of mailing copies of the counterclaim do not constitute harassment under any other provision of N.J.S.A. 2C:33-4, those acts may still be relevant

VII.

As we have noted, the purpose to harass is an essential element of all variations of the harassment offense defined in N.J.S.A. 2C:33-4. See supra note 4. Defendant contends the trial court abused its discretion in finding that he had a purpose to harass when he disseminated copies of the counterclaim. We disagree. In Hoffman, the Court explained that "[a] finding of a purpose to harass may be inferred from the evidence presented," noting "[c]ommon sense and experience may inform that determination." 149 N.J. at 577 (citations omitted). There was ample evidence adduced at the hearing from which the trial court could reasonably infer that defendant had a purpose to harass plaintiff.

Notably, the trial court found defendant's testimony that he was acting as a whistleblower to be "absolutely not credible." The court added that defendant's claim "can't even hold water when . . . [he] sen[t] it to [plaintiff's] parents. That's not a whistleblower situation . . . it doesn't rise for a legitimate reason or a good purpose other than harassment to send that to [plaintiff's] parents." The trial court ultimately determined there was "no justification for [] defendant's choice to send those documents other than to harass [] plaintiff," and

---

in determining whether other alleged acts of harassment were committed with the requisite purpose to harass.

that the true reason defendant disseminated the counterclaim was because defendant was "angry and he wanted to send a message to [] plaintiff."

This finding was based on the trial court's credibility assessment of defendant's live testimony to which we defer. Cesare, 154 N.J. at 412 (quoting J.W.D., 149 N.J. at 117).

## VIII.

The trial court correctly noted that an FRO may be issued based on any one of the predicate acts listed in N.J.S.A. 2C:25-19(a). When a court chooses to rely on a single predicate act, disregarding other acts alleged in the TRO complaint, it runs the risk that a remand may be needed if a reviewing court finds a problem with the lone predicate act the trial court relied on.

In this case, the trial court's ruling focused solely on the predicate act of harassment, and more specifically, the dissemination of the counterclaim. The court did not make findings of fact and law with respect to plaintiff's allegations that defendant also committed predicate acts of stalking and criminal coercion. We instruct the court on remand to determine whether plaintiff proved either or both of those predicate acts by a preponderance of the evidence.

IX.

Although we are remanding this case for the trial court to first determine whether defendant committed a predicate act of domestic violence—the first step in the <u>Silver</u> two-step analytical process—we deem it appropriate to address defendant's contention the trial court erred in applying the second prong of the <u>Silver</u> test. That prong requires a court to consider "whether a restraining order is necessary, upon an evaluation of the fact[or]s set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further abuse." <u>J.D.</u>, 207 N.J. at 475–76 (quoting <u>Silver</u>, 387 N.J. Super. at 127).

Defense counsel asserted at oral argument an FRO may be issued only if the court finds that a defendant poses a risk of <u>physical</u> violence to the victim. We reject that narrow interpretation of the PDVA. Although the prevention of physical harm is without question one of the statute's most critical objectives, the PDVA also protects domestic violence victims from emotional harm and control inflicted by domestic violence offenders. The Legislature stated unequivocally its intent "to assure the victims of domestic violence the maximum protection from abuse the law can provide." N.J.S.A. 2C:25-18.

23

The definition of domestic violence set forth in N.J.S.A. 2C:25-29(a), moreover, expressly includes harassment under all sections of N.J.S.A. 2C:33-4, thereby encompassing verbal, non-physical forms of harassment, subject to the constitutional limitations explained in Burkert and Hoffman. Defendant's contention that the term domestic violence for purposes of the second Silver prong means physical violence is simply wrong.

In addition, the second prong of the Silver test embraced by our Supreme Court in J.D. refers to the need "to protect the victim from an immediate danger or to prevent further abuse." J.D., 207 N.J. at 476 (emphasis added) (quoting Silver, 387 N.J. Super. at 127). The disjunctive formulation indicates that an FRO may be issued even in the absence of an "immediate danger" to the victim, so long as the trial court finds the protections of an FRO are needed to prevent further abuse. The phrase "further abuse," moreover, includes the risk of repetition of the misconduct found to constitute the predicate act of domestic violence in the first prong of the two-pronged test.

In this instance, we believe there is substantial evidence in the record to support the trial court's conclusion that an FRO was needed to protect plaintiff from further acts of domestic violence. The court had an opportunity to personally observe defendant as he testified and found that defendant "clearly

24

has not gotten over the fact that his wife has cheated on him. It angers him." The court concluded that "until [defendant] starts to get a better hold of his emotions[,] . . . there is a legitimate and reasonable fear of future acts of domestic violence." We defer to the Family Part judge's expertise in making such determinations. Cesare, 154 N.J. at 412 (quoting J.W.D., 149 N.J. at 117).

In sum, although the trial court's second-prong analysis under Silver may be moot unless the court on remand finds plaintiff proved all the elements of at least one predicate act of domestic violence, we believe the trial court did not abuse its discretion in concluding that plaintiff reasonably feared that she would be subjected to future domestic violence unless an FRO were issued.

## X.

For the foregoing reasons, we vacate the FRO and remand for the trial court to make additional findings of law and fact in accordance with this opinion. The trial court shall act as expeditiously as practicable. We offer no view on whether plaintiff proved by a preponderance of the evidence that defendant committed all the material elements of at least one predicate act of domestic violence. The trial court, on reflection, is free to reach a different conclusion than the one originally made.

A-3623-18T1

To assist the court, we direct the parties to supply it with their appellate submissions if they have not already done so. We leave it to the discretion of the court whether to permit or require further submissions, argument, or presentation of evidence.

All restraints imposed on defendant by the trial court under the FRO shall remain in effect until the trial court renders its decision on remand. We do not retain jurisdiction.

Affirmed in part and reversed and remanded in part.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

26