# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1643-19T3

D.G.,[1]

    Plaintiff-Respondent,

v.

A.M.K.,

    Defendant-Appellant.

_____

         Argued December 14, 2020 – Decided January 4, 2021

         Before Judges Mayer and Susswein.

         On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-0745-20.

         Brian D. Kenney argued the cause for appellant (Einhorn, Barbarito, Frost & Botwinick P.C., attorneys; Brian D. Kenney, of counsel and on the briefs; Matheu D. Nunn, on the briefs).

         Dalya Youseff argued the cause for respondent (Central Jersey Legal Services, Inc., attorneys; Dalya Youssef, on the brief).

---

[1] We refer to the parties by initials in accordance with <u>Rule</u> 1:38-3(d)(10).

PER CURIAM

Defendant A.M.K. appeals from a November 14, 2019 final restraining order (FRO) entered in favor of plaintiff D.G. pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. We affirm.

We provide a detailed recitation of the facts based on the testimony presented during the domestic violence trial. Plaintiff and defendant were married for approximately two months when plaintiff filed for a temporary restraining order (TRO). The couple knew each other for "about six months" before they married. Prior to marrying defendant, who lived in the United States, plaintiff lived with her two daughters in Qatar for nine years. The couple did not have children together.

Both parties testified at trial regarding the events leading to the entry of the TRO. In addition, the principal of the school attended by plaintiff's older daughter testified.

Plaintiff testified regarding the incidents that precipitated her application for the TRO. In late September 2019, defendant asked plaintiff to help him cheat on his engineering exam. Plaintiff helped defendant complete the exam and assisted with his homework until October 10, 2019. On that date, plaintiff told

defendant she would no longer help with his schoolwork and was leaving the marriage.

Defendant explained if plaintiff was unwilling to help him, he would not assist with her immigration application or furnish money for the application. Despite defendant's statement, plaintiff repeated she was leaving the marriage. Defendant then stated, "[A]ll of you are bitches. I have a gun with 15 bullets . . . . I'm going to put five in your head, five in [my ex-wife's] head, I'm going to have five to spare."[2]

Defendant's threat to shoot plaintiff was witnessed by plaintiff's daughters, who "were crying and screaming." Plaintiff begged defendant to stop his behavior in front of the children. Plaintiff then fled with the children to her uncle's house.

Plaintiff testified to an earlier incident on September 30, 2019, when defendant, plaintiff, and the children went out to dinner. While defendant was driving home, plaintiff and defendant argued. Plaintiff told defendant he was a "fraud" and she did not "want to be part of [his] life anymore." According to

---

[2] Although she had never seen the weapon, plaintiff knew defendant had a gun inside a safe in the apartment.

plaintiff, defendant lied about his credit card debt[3] and "completely misrepresented himself to [her] regarding his finances and his education, and what happened with his ex-wife." Plaintiff stated defendant "hit the steering wheel, . . . got really, really angry and drove . . . dangerously" almost causing an accident. Plaintiff and the children were afraid based on defendant's erratic driving.

Plaintiff explained she did not apply for a TRO after the driving incident because she wanted to make the marriage work. Plaintiff testified, "I just married . . . him, I left my whole life for him, my country, my dream job, left my house, my car, everything." She also lacked familiarity with New Jersey's domestic violence law.

After the October 10 incident, plaintiff decided to seek a TRO. About a week after that incident, plaintiff filed for a TRO. Plaintiff explained it took a week to file the application because her "kids were devastated," her "mind froze," and she "lost everything." While there was no history of domestic violence prior to September and October, plaintiff stated she only lived with defendant for a short time. However, during their short marriage, plaintiff stated defendant would smash and hit objects when he became angry.

---

[3] Plaintiff claimed defendant's debt exceeded $50,000.

A-1643-19T3

Plaintiff's TRO was based on the predicate acts of harassment, terroristic threats, stalking, criminal coercion, and any other crime involving risk of death or serious bodily injury. The TRO barred defendant from contacting plaintiff and her children. Additionally, defendant was prohibited from going to plaintiff's residence and place of employment.

On October 23, 2019, plaintiff amended the TRO. The asserted predicate acts remained the same, but plaintiff added defendant's appearance at her daughter's school despite his receipt of the TRO. The amended TRO precluded defendant from going to the child's school and prohibited defendant from contacting plaintiff's uncle.

Plaintiff denied her immigration status was the reason she married defendant. Plaintiff testified she married defendant because he promised a "happy, peaceful life" and said the family would return to Qatar when he obtained his engineering degree.

Defendant's testimony regarding the events precipitating the TRO differed significantly from plaintiff's testimony. According to defendant, on October 10, he placed a tape recorder in plaintiff's car without her consent because "she ke[pt] pushing [him] . . . to start the immigration paper[s], to put the application to have the green cards." Defendant assumed plaintiff would talk to her friends

on the cellphone while she was driving, and he wanted to know whether plaintiff married him for immigration benefits or love. After listening to the recording, defendant confronted plaintiff about their marriage. Plaintiff then announced her intention to leave the marriage and move out of the apartment.

Later that day, defendant met plaintiff at her uncle's home and stated he wanted a divorce. According to defendant, he never threatened to shoot plaintiff or his ex-wife. He maintained plaintiff was lying about the events of October 10.

Regarding his ownership of a gun, defendant testified he had a gun locked in a safe box in the bedroom closet. Defendant explained he never removed the gun from the safe during his marriage to plaintiff. However, defendant did tell plaintiff he owned a gun.

Regarding his debt, defendant testified he gave all his furniture to a cousin prior to plaintiff's arrival and made improvements to apartment, resulting in his incurring debt. According to defendant, plaintiff and defendant purchased many items for the apartment. Defendant explained plaintiff took all the furnishings when she moved out.

When asked about the driving incident on September 30, defendant admitted he was driving but stated, "Nothing happened that day." Defendant

6

subsequently conceded, "Maybe [he and plaintiff] talk[ed], but we didn't try to get in an accident or anything or we didn't get angry. All [of what plaintiff said] is . . . not true. [It] never happened." Defendant also testified he never discussed money or debt at that time.

Explaining why he went to the child's school on October 21 despite having been served with the TRO, defendant testified he received daily emails from the school, starting on October 15, asking about the child's whereabout because the child had been absent from class. Defendant decided to respond to the emails in person because the school was "two seconds" from his apartment. Defendant claimed he went to the school to remove his name from the email notification list regarding plaintiff's daughter. He also told the school the child did not live with him but gave the school the telephone number for plaintiff's uncle. Defendant testified he "didn't know I [could not] go to the school."

The trial judge also heard testimony from the school's principal. The principal testified she saw defendant on October 21 around nine or ten in the morning. Defendant first "asked the secretary if his stepdaughter . . . was in school." The secretary got the principal, who spoke with defendant. The principal explained the child was not at school that day. According to the principal, defendant asked if she knew the child's whereabouts. The principal

replied the child had been absent from school for several days, and the school needed to know her location or report the child as missing. The principal testified defendant explained he had "no way of getting in touch with [the child]" and was unable to call plaintiff about the child. The principal confirmed defendant gave her a telephone number for plaintiff's relative.

After defendant left the school, the principal called the telephone number given to her by defendant. No one answered, and the principal left a message. About an hour after the principal placed the telephone call, plaintiff arrived at the school and explained she had a restraining order against defendant.

At the conclusion of the one-day trial, the judge entered an FRO against defendant. The judge made credibility determinations and found "credibility issues with both of these litigants. And I don't find they have been forthright with this [c]ourt as to exactly what took place in this matter." However, based on the evidence and testimony, the judge found defendant less forthright and credible, particularly his explanation of why he went to the child's school.

Regarding the events on October 10 which led to the TRO, the judge determined defendant told plaintiff, "If you leave me . . . I'm going to take the gun from my safe and kill you and all you bitches. I have 15 bullets in my gun and five of them will go in your head, five will go in [the ex-wife's] head . . .

and I'll still have five left." The judge found defendant made this threat in front of the children.

The judge found defendant's conduct satisfied the predicate acts of harassment, N.J.S.A. 2C:33-4, and terroristic threats, N.J.S.A. 2C:12-3. He concluded plaintiff knew defendant had a gun in the house and defendant threatened to use the gun against plaintiff. The judge found the purpose of defendant's statement about using the gun was to "harass or seriously annoy or alarm." He also found "a threat to commit a crime of violence" and "the victim reasonably believed the immediacy of the threat and the likelihood that it would be carried out . . . ."

The judge then considered the second prong of the Silver analysis. The judge analyzed the factors under N.J.S.A. 2C:25-29(a) and found "the existence of immediate danger to person or property" and defendant's "threat in and of itself is one of an egregious nature . . . ." He also concluded "it is not in the best interests of any victim or child to live under what they may consider to be this lingering threat and I do find it to be an egregious threat." In addition, the judge noted defendant's "willful violation of the [TRO] . . . leads me to conclude that, in fact, a final restraining order is required in this case."

On appeal, defendant argues the Family Part judge erred in issuing the FRO. He contends plaintiff failed to prove a predicate act of domestic violence by a preponderance of the evidence. In addition, he asserts the judge's determination was contrary to the weight of the credible evidence. Further, defendant claims plaintiff failed to satisfy either prong of the Silver[4] test. We reject these arguments.

Our scope of review of Family Part judges' orders is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). We owe substantial deference to the Family Part judge's findings of fact because of his or her special expertise in family matters. Id. at 413. "Deference is especially appropriate 'where the evidence is largely testimonial and involves questions of credibility.'" Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). A judge's fact-finding is "binding on appeal when supported by adequate, substantial, credible evidence." Id. at 411-12 (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974)). However, we owe no special deference to the trial judge's "interpretation of the law and the legal consequences that flow from established facts." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

---

[4] Silver v. Silver, 387 N.J. Super 112 (App. Div. 2006).

When determining whether to grant an FRO under the PDVA, a judge must undertake a two-part analysis. Silver, 387 N.J. Super. at 125-27. First, "the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. Second, the judge must determine whether a restraining order is necessary to protect the plaintiff from future acts or threats of violence. Id. at 127.

Since this case turned almost exclusively on the testimony of the witnesses, we defer to the Family Part judge's credibility findings as he had the opportunity to listen to the witnesses and observe their demeanor. Gnall v. Gnall, 222 N.J. 414, 428 (2015). We discern no basis on this record to question the judge's credibility determinations.

Under the first prong of Silver, plaintiff alleged defendant committed the predicate acts of harassment and terroristic threats under the PDVA. A person is guilty of harassment where, "with [the] purpose to harass another," he or she:

> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or

c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

[N.J.S.A. 2C:33-4(a) to (c).]

Harassment requires the defendant to act with the purpose of harassing the victim. J.D. v. M.D.F., 207 N.J. 458, 486 (2011). A judge may use "[c]ommon sense and experience" when determining a defendant's intent. State v. Hoffman, 149 N.J. 564, 577 (1997) (citing State v. Richards, 155 N.J. Super 106, 118 (App. Div. 1978)).

A person commits the predicate act of terroristic threats

> if [that person] threatens to commit any crime of violence with the purpose to terrorize another or . . . threatens to kill another with the purpose to put [that other person] in imminent fear of death under circumstances reasonably causing the victim to believe the immediacy of the threat and the likelihood that it will be carried out.

[N.J.S.A. 2C:12-3.]

Proof of terroristic threats must be assessed by an objective standard. State v. Smith, 262 N.J. Super. 487, 515 (App. Div. 1993). "The pertinent requirements are whether: (1) the defendant in fact threatened the plaintiff; (2) the defendant intended to so threaten the plaintiff; and (3) a reasonable person would have believed the threat." Cesare, 154 N.J. at 402.

Having reviewed the record, we are satisfied there was sufficient credible evidence supporting the judge's determination that defendant committed the predicate acts of harassment consistent with the PDVA. When defendant said he would put five bullets in plaintiff's head with the gun he kept in the apartment, the judge found he made a communication and engaged in conduct that was likely to alarm plaintiff and done with the purpose to alarm her. N.J.S.A. 2C:33-4(a) and (c).

The same statement made by defendant to plaintiff also satisfied the predicate act of terroristic threats. N.J.S.A. 2C:12-3. Defendant threatened to shoot plaintiff in the head five times and had ready access to a gun. When defendant threated to kill plaintiff on October 10, she immediately left the apartment with her children and fled to the safety of a relative's home. Based on these facts, the judge found plaintiff reasonably believed defendant would follow through on his threat to kill her. We are satisfied there is ample evidence in the record to support the judge's findings that defendant committed the predict acts of harassment and terroristic threats in support of the first Silver prong.

We next consider defendant's claim that the judge erred in finding plaintiff required an FRO to protect her from future acts or threats of domestic violence. In determining whether a restraining order is necessary, the judge must evaluate

the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6) and, applying those factors, decide whether an FRO is required "to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127.

Here, based on the credible testimony, the judge found plaintiff was afraid of defendant, feared defendant would kill her with the gun he kept in the apartment, and did not feel safe, even while she was in the courtroom. He also noted defendant violated the TRO by going to the child's school and asking if the child was present because the TRO precluded defendant from communicating with the child. After analyzing the statutory factors and other considerations, the judge properly concluded plaintiff required an FRO to protect her from further abuse by defendant.

We are satisfied the FRO was necessary to protect plaintiff from further abuse by defendant and there was sufficient evidence in the record to support the judge's findings under both Silver prongs.

To the extent we have not addressed any remaining arguments, we conclude those arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

14                                                           A-1643-19T3