# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1060-22

A.F.L.,[1]

    Plaintiff-Respondent,

v.

M.L.,

    Defendant-Appellant.

_____

    Submitted April 16, 2024 – Decided May 8, 2024

    Before Judges Whipple and Augostini.

    On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FV-15-0412-23.

    Evan F. Nappen Attorney at Law, PC, attorneys for appellant (Andrew M. Megill, on the brief).

    Buchan, Palo & Cardamone, LLC, attorneys for respondent (Stephanie Palo, of counsel and on the brief).

---

[1] We use initials and pseudonyms to protect the parties' privacy and preserve the confidentiality of these proceedings. <u>R.</u> 1:38-3(d)(9) to (10).

PER CURIAM

Defendant M.L. appeals from an October 25, 2022 final restraining order (FRO) entered in favor of plaintiff A.F.L. pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35.  We affirm.

We recite the facts from the witnesses' testimony given during the one-and-a-half-day trial.  The parties are married and lived together until July 2022, when plaintiff obtained her first temporary restraining order (TRO) against defendant.

In the July 2022 TRO, plaintiff alleged defendant, while intoxicated, engaged in harassing conduct by repeatedly calling her derogatory names and waking her and the children to instigate arguments.  During this incident, plaintiff testified defendant entered the parties' bedroom while intoxicated, removed a firearm he owned from a drawer, and "stuff[ed]" the firearm "into the waist of his pants."  Defendant later told an unidentified individual over the telephone that plaintiff would "definitely be sorry" before grabbing a second firearm which he "carr[ied] . . . around . . . [p]ointed upward."  Defendant, with the pistol in his waistband, "passed out in [their] daughter's room."

A-1060-22

Plaintiff voluntarily withdrew this domestic violence complaint and dismissed the TRO. The parties entered a consent order with civil restraints on July 19, 2022. In pertinent part, the parties agreed,

> [H]e/she shall not in any way approach, threaten, stalk, harass, assault, or cause to be harassed or stalked, the other party, whether in person, via telephone or in writing. This includes any interference with Social Media or other personal accounts.

The parties also agreed to have "reasonable and non-harassing communications limited to issues regarding their children" through Our Family Wizard (OFW). The entry of this consent order did not preclude either party from seeking a TRO in the future.

The incident leading to plaintiff's second application for a TRO occurred on September 1, 2022, after the parties separated and plaintiff was living with her mother. That evening, after finishing work, plaintiff participated in a fantasy football draft and posted an image on Facebook showing her computer next to a can of beer. A family member sent this image to defendant, who then began messaging plaintiff accusing her of violating the consent order by consuming alcohol "before or during their parenting time."

3

Plaintiff responded, "I'm not home and have a sitter.  Nice try lol."[2] (meaning "laugh out loud").  Later that evening, around 9:30 p.m., defendant sent another message to plaintiff: "Contrary to what you say, your a failed parent."  At 9:55 p.m., defendant sent plaintiff a picture of her car "parked in [her] mother's driveway," which plaintiff believed was taken "at the time the message was sent." The following message accompanied the picture: "Your registered vehicle is at your mothers home.  So again, you're playing games? Your consuming alcohol, possibly fucking your boss [Jon].[3] "

> At 10:03 p.m., defendant sent the following message to plaintiff's boss:

> Hey [Jon]!  You fucking illegitimate coward.  Get fucked, You think I didnt know about you.  You gave yourself up when you blocked me . . . . Fuck you.  I should've told your wife two years ago?  About your plans.  If I ever see you again, We'll play ball . . . and that means I'll break your fucking jaw.  Tell [Jane][4] I said hello.

At 10:06 p.m., defendant messaged plaintiff again stating: "Best thing since separating myself from you, is you killed your father.  And my life, soul, and

---

[2]  We quote verbatim from the parties' text messages admitted into evidence during the domestic violence trial.

[3]  This is a pseudonym.

[4]  This is a pseudonym.

consciences is pure.  Take care."[5]  Defendant then sent plaintiff a screenshot of

the message he sent to her boss and stated:

> This is the last communicatuirb no.
>
> Keep fucking your boss, you are the most pathetic person, I've ever known.  I called you out years/months ago, and you played yourself, said [Jane's] name, plus called me [Jon].  You are the most disrespectful, manipulative, sorry mother fucker in my life.  I hate you, I will never, ever, ever, ever be in your countenance ever again.
>
> And when our daughters are old enough, they'll know the truth.  You ducking weirdos are still all about watching your mommy and daddy have sex on a 90'd computer.[6]  I fucking pitty you.  Tell your brothers they couldn't touch me if they had super powers . . . I'm done. Night[.]

Plaintiff testified at trial that these communications left her feeling scared,

particularly because defendant "ha[d] a history of substance abuse and

alcoholism."  Plaintiff believed that defendant was intoxicated when he sent

these messages.

---

[5]  During the domestic violence trial, plaintiff testified defendant's message referenced her father's June 2022 suicide, and claimed defendant "ha[d] been going around alleging that [she] murdered [her] father."

[6]  At the hearing, plaintiff testified that, after her father passed away, she found a flash drive among his belongings containing media of "[her] parents being intimate with each other, which [she] turned over to [her] mother."

A-1060-22

Defendant did not dispute the events of September 1, 2022, or that he sent these messages to plaintiff. Defendant testified that the picture from plaintiff's Facebook page demonstrated plaintiff violated the consent order. Defendant contended he was rightfully concerned about the safety of the children, which was why he drove by the residence and took the picture of plaintiff's car.

Regarding the message defendant sent to plaintiff's boss, defendant characterized it as "a momentary lapse of judgment"; however, he denied being intoxicated or intending to harass plaintiff that evening. Defendant further testified he had a substance abuse evaluation at plaintiff's request and "passed with flying colors."

Plaintiff testified to numerous prior incidents of domestic violence committed by defendant. She also stated defendant was often intoxicated. For instance, in April 2019, defendant "came home intoxicated," woke plaintiff from her sleep, and threatened to wake their six-month-old baby. Plaintiff also described defendant returning home late one evening in April 2020 intoxicated, with his face bleeding. He said he had been in a car accident and totaled the car. Defendant passed out, and the next morning, while plaintiff was packing to leave with their child, he physically blocked plaintiff and prevented her from leaving the residence.

A-1060-22

In September 2021, while plaintiff was pregnant, defendant threatened to lock her out of the house and throw her computer into the rain. Two months later, while still pregnant, defendant threatened to "throw [plaintiff] down the fucking stairs" during an argument.

Plaintiff further testified that in the spring of 2022, after waking defendant to help care for their second child, defendant told her she "was a shitty mother, that [she] didn't know what he was capable of, that he was an alpha male killer, that he would kill [her] if [she] woke him up again[,] . . . [a]nd that if [she] called the police he would shoot a cop." Plaintiff stated defendant held a gun during this incident, and later, "came to [her] side of the bed," "handed [her] the firearm," and said, "I want you to kill yourself."

In May 2022, defendant, while intoxicated, called her "a whore with a degree," "white trash," and "a piece of trash.". Plaintiff recently gave birth at that time, and defendant told her she was fat and disgusting and that he refused to have relations with her.

Defendant denied these past incidents. Regarding the July 2022 incident with the weapon, defendant denied acting in an unsafe manner with any weapon or using it to intimidate or threaten plaintiff. Although he denied menacing

plaintiff, he acknowledged retrieving his pistol and "messing around with it" during this incident.

Plaintiff explained that an FRO was necessary because defendant "ha[d] a substance abuse issue," "c[ould]n't control himself," and "clearly d[id] not understand the concept of boundaries." Plaintiff further claimed she was "afraid" of defendant, "d[idn't] feel safe anymore," and believed a restraining order was "necessary to protect [her] and [her] children." Plaintiff conceded defendant "ha[d] never physically harmed [her]," but believed he could.

The judge found jurisdiction based upon the parties' marital status. In finding defendant committed the predicate act of harassment, the judge found plaintiff's testimony regarding the event more credible than defendant's testimony. In his oral decision placed on the record, the judge stated:

> Plaintiff's description of defendant's alcohol abuse frankly is more credible than [] defendant. I find he has minimized his use of alcohol, testifying that at one point during the marriage he had undergone an evaluation and there was no recommendation or any problem. This is in total conflict with [] plaintiff's description of the drinking that was going on in the household during the deterioration of the marriage.
>
> And I find frankly that the conduct described by [] plaintiff is perhaps explainable by the consumption of alcohol with respect to taking out the guns, brandishing the guns, and the offensive language that he directed at [] plaintiff.

8

It doesn't strike the [c]ourt as likely that [] plaintiff would make up the term I'm an alpha male killer[,] [which] rings true despite [defendant's] denial. Plaintiff's description of gun play when intoxicated is credible. And while [] defendant may be a trained veteran, it strikes the [c]ourt as poor and inadvisable judgment[,] particularly with two minor children in the household.

Even [] defendant indicated [the parties] argued a lot. [] [D]efendant's verbal abuse was credibly put forth by [] plaintiff[.] [R]eference[s] to [plaintiff's] father's suicide, whore with a degree, [and] white trash were uttered with a purpose to alarm and seriously annoy.

More specifically the [c]ourt finds the communications by [] defendant on September 1, albeit initially not harassing, escalated over a four[-]hour period and later that evening were in a manner that caused annoyance and alarm, particularly with a [screenshot] sent to [] plaintiff and a threat to break [plaintiff's boss's] jaw. Here there is a reference to a physical assault in the mind of [] defendant.

So it is objectively reasonable for [] plaintiff to have been alarmed and frightened by the prospect of such physical violence, even though it was not directed at her.

[] [D]efendant's explanation as a momentary lapse of judgment really was not momentary. It progressed. And I think a reasonable inference can be drawn that the inappropriate language later that evening may in fact, as [] plaintiff perceived his conduct, been generated and driven by the consumption of alcohol.

9

> The [c]ourt finds [] plaintiff testified credibly to a past history of threats. [Defendant] threatened to kill her, calling himself an alpha male, handing her a gun, telling her to shoot herself, [and] threatening to throw her down the stairs, which are, in the [c]ourt's opinion, self[-]evident and satisfy the second prong under Silver [v.] Silver.[7]

While the judge found plaintiff proved the predicate act of harassment, he concluded there was no evidence to support the second predicate act of stalking. Next, the judge concluded that an FRO was necessary to protect plaintiff from further danger and to prevent defendant from committing future acts of domestic violence against plaintiff.

On appeal, defendant contends the judge erred in finding harassment because there was insufficient evidence upon which to find that he acted with the requisite intent and purpose to annoy or alarm plaintiff. Defendant further argues the judge erred by finding a restraining necessary pursuant to the second prong of Silver. In addition, defendant asserts the harassment statute is unconstitutional. We disagree.

Our review of an FRO is generally limited. C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially

---

[7] Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006).

trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" Ibid. (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)). "Deference is especially appropriate [in bench trials] 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). A trial judge who observes witnesses and listens to their testimony is in the best position to "make first-hand credibility judgments about the witnesses who appear on the stand." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008). Therefore, we will not overturn a judge's factual findings and legal conclusions unless we are "convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interest of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Col. of Am., 65 N.J. 474, 484 (1974)).

In deciding whether to grant an FRO, a trial court must engage in a two-step inquiry. Silver, 387 N.J. Super. at 125-27. "First, the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Id. at 125. The judge must construe any such alleged acts in light

11

A-1060-22

of the parties' history to better "understand the totality of the circumstances of the relationship and to fully evaluate the reasonableness of the victim's continued fear of the perpetrator." In re Kanaszka v. Kunen, 313 N.J. Super. 600, 607 (App. Div. 1998); N.J.S.A. 2C:25-29(a)(1).

Second, after finding a predicate act, the judge must determine whether a restraining order is necessary to protect the plaintiff from immediate harm or further abuse. Silver, 387 N.J. Super. at 127. "[T]he guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to – 29[(a)](6) . . . . " Ibid.

Here, the judge found defendant committed the predicate act of harassment, one of the delineated offenses under the PDVA. A person is guilty of harassment under N.J.S.A. 2C:33-4:

> [I]f, with purpose to harass another, [a person]:
>
> a. Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

The judge properly evaluated defendant's conduct on September 1, 2022 in the context of the prior incidents of domestic violence and the totality of the parties' relationship, and found defendant purposefully committed acts constituting harassment. While the judge did not specifically refer to subsection (a) of N.J.S.A. 2C:33-4 in his findings, he found that defendant's "communications" on September 1, "albeit initially not harassing, escalated over a four[-]hour period and later that evening were in a manner that caused annoyance and alarm." The judge credited plaintiff's description of defendant's alcohol abuse and found that the conduct described during plaintiff's testimony regarding events during the evening of September 1st was "explainable by the consumption of alcohol." The judge further found plaintiff's testimony of defendant's past verbal abuse, which included calling plaintiff vulgar and derogatory names, shed light on defendant's conduct and intent at the time of the domestic violence trial. These findings, together with the text messages admitted into evidence, amply support the judge's finding of harassment under N.J.S.A. 2C:33-4(a).

The judge also found defendant's threat of violence toward plaintiff's boss, threatening to break the boss's jaw, reasonably likely to alarm plaintiff and cause her fear "even though [the threat of violence] was not directed at her." In

A-1060-22

rejecting defendant's explanation "as a momentary lapse of judgment," the judge appropriately noted that defendant's conduct was not fleeting but instead escalated over several hours, and likely "generated and driven by the consumption of alcohol."

Arguably, the messages sent earlier in the evening on September 1 were not harassing, as the judge noted. However, defendant's 10:06 p.m. message, alleging plaintiff "killed [her] father" as well as his subsequent message containing threatening and profane language directed to plaintiff's boss had no legitimate purpose other than to annoy and alarm plaintiff. As the judge correctly concluded, defendant's messages escalated in their offensive nature and persistent manner throughout the evening, indicating defendant's intent to disturb, irritate, and bother plaintiff.

After finding defendant committed the predicate act of harassment, the judge analyzed the second prong of Silver to determine whether an FRO was necessary to protect plaintiff from further abuse. The judge credited plaintiff's testimony regarding prior threats of violence, including threatening to kill plaintiff, handing plaintiff a gun while telling her to go and kill herself, and threats to "throw her down the stairs," which the judge concluded made the need for an FRO "self[-]evident." Not only did the judge find a history of domestic

violence, but the parties' consent order entered only months prior to the domestic violence trial did not prevent defendant from continuing further harassing communications. Based on these findings, we discern no error in the judge's conclusion that an FRO was necessary to prevent further abuse.

Lastly, defendant challenges the constitutionality of the harassment statute, N.J.S.A. 2C:33-4. Defendant acknowledges the New Jersey Supreme Court upheld the constitutionality of the harassment statute in State v. Hoffman, 149 N.J. 564 (1997), but argues plaintiff's allegations of harassing communications involve electronic messaging which was not prominent when Hoffman was decided. Therefore, defendant urges us to revisit this issue.

We decline to do so and add only the following comment. The relevant provision of the harassment statute, N.J.S.A. 2C:33-4(a), addresses the forms of prohibited speech barred by their content and not limited to the method or means by which the harmful words are relayed. Notwithstanding the prominence of electronic or text communications, the holding in Hoffman remains good law. We discern no distinction between the type of communication at issue in Hoffman and type of communication here.

A-1060-22

To the extent we have not specifically addressed any other contentions raised by defendant, it is because they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

16