149 N.J. 108 (1997)
693 A.2d 92
IN THE MATTER OF RETURN OF WEAPONS TO J.W.D.
The Supreme Court of New Jersey.
Argued January 7, 1997.
Decided May 6, 1997.
*110 James C. Lankford, Assistant Prosecutor, argued the cause for appellant State of New Jersey (Sharon B. Ransavage, Hunterdon County Prosecutor, attorney).
Gary J. Needleman, argued the cause for respondent J.W.D. (Needleman and Schocket, attorneys; Irene A. Cirolla, on the brief).
The opinion of the Court was delivered by POLLOCK, J.
The dispositive legal issue is whether a defendant in an action under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -33 ("Domestic Violence Act" or the "Act"), is entitled to the return of firearms if the trial court, after dismissing the domestic violence complaint, concludes that the defendant poses a threat to public health, safety, or welfare. The Chancery Division, Family Part, held that defendant posed such a threat, notwithstanding its prior dismissal of the domestic violence complaint. Consequently, the court ordered the disposition of defendant's guns under N.J.S.A. 2C:25-21d(3) and N.J.S.A. 2C:58-3c, the statute pertaining to the licensing of firearms. The Appellate Division agreed that the Family Part had the authority to retain and dispose of the weapons, but disagreed with the trial court's finding that defendant posed a threat to the public. 290 N.J. Super. 451, 676 A.2d 138 (1996). It directed the Hunterdon County Prosecutor to return defendant's guns to him. We granted the State's petition for certification. 146 N.J. 496, 683 A.2d 199 (1996). We affirm the holding that the Family Part has the authority to retain and dispose of weapons even after the dismissal of a domestic violence complaint. We remand the matter to the Family Part for further factual findings on the issue of the return to defendant of his weapons.

I
S.D. and defendant, J.W.D., are now divorced. Before their divorce, S.D. filed two domestic violence complaints against defendant *111 in two years. On June 2, 1992, when S.D. filed the first domestic violence complaint, the police confiscated defendant's guns and firearms purchaser identification card. S.D. agreed to dismiss the complaint, separate from defendant, and attend counseling with him.
On dismissal of the complaint, defendant wrote to the Hunterdon County Prosecutor's Office for the return of the guns and the card. In his letter, defendant, who has a Ph.D. in chemistry, explained:
It would be a trivial matter for me to enter any hardware store and leave with enough common materials to fabricate a highly effective firearm and ammunition to use in it. The so called weapons which you have confiscated from me are sporting instruments which amuse me and have great emotional attachment as a result of many happy hours of recreation.
The Hunterdon County Prosecutor's Office returned defendant's weapons and firearms identification card.
S.D.'s and J.W.D.'s attempts at reconciliation failed, and on August 27, 1992, S.D. filed for divorce. While the divorce action was pending, she filed the second domestic violence complaint. The complaint arose out of a confrontation on December 26, 1994, when S.D. went to defendant's house to pick up their son, who was visiting defendant. On filing the complaint, S.D. obtained a temporary restraining order that again required confiscation of defendant's weapons and firearms purchaser identification card. Accordingly, the police confiscated defendant's Browning Challenger .22 caliber semi-automatic long rifle, Star .380 caliber semi-automatic, Remington 700 30-06 caliber bolt action rifle, Remington 870 twelve gauge pump action shotgun, and identification card. Defendant filed a cross-complaint in the domestic violence action.
In a hearing before the Family Part, the following facts emerged. When S.D. went to pick up her son, he was not wearing a new coat that he had worn when he went to defendant's house. S.D. told defendant that she wanted the coat. J.W.D. tried to close the door. S.D. put her foot between the storm door and the house door. She claimed that defendant then tried to push her off the porch.
*112 At the hearing, S.D. presented photographs showing bruises that she sustained as the result of the altercation. Defendant claimed that S.D. had scratched him. S.D. claimed that she scratched J.W.D. while trying to hold onto him after he pushed her so she would not lose her balance. At the conclusion of the hearing, the Family Part dismissed the complaints and dissolved the temporary restraining order.
Defendant then sent a second letter to the Hunterdon County Prosecutor's Office requesting the return of his weapons. In it, he stated that "[t]his law like so many others is being used by women to punish men." Defendant enclosed a copy of the letter he had written to the prosecutor's office when his weapons had been seized as a result of the earlier domestic violence complaint.
After conducting an investigation, which included interviewing S.D., the prosecutor filed an objection to the return of the weapons and identification card to defendant.

II
The weapons hearing proceeded on May 25, 1995, before the same judge who had presided over the domestic violence hearing. S.D. testified about the events of December 26, 1994. She also recounted an incident that had occurred on September 15, 1992, when, shortly after the couple separated, she returned to the marital home to retrieve her belongings. According to S.D., defendant had affixed Post-it notes to the windows stating "Danger, enter at your own risk." Rather than open the door, S.D. peered into the kitchen window, where she saw a device that looked like a spring gun covered with a towel and a cord that seemed to be connected to the door. S.D. believed she would be injured by the contraption if she were to use the door. On looking into the garage, she saw a device under a blanket that looked like a rifle rigged to fire if she entered. S.D. left the premises. She returned later, entered the home through a window, and discovered that the "gun" was a drill under a towel and the "rifle" was a broom attached to a string. The Post-it notes were gone.
*113 S.D. also recounted that in the course of their marriage, defendant would play country-western music, strap on a holster, and walk around the house drawing his gun. She did not know if the gun was loaded during these incidents.
Defendant testified that S.D.'s account of the booby-trapped doors was a "total fabrication" and denied placing the Post-it notes on the windows. Concerning the allegation that he had rigged a drill to look like a gun, he explained, "[i]f there was a tool there, there could have been a towel over it or something, but certainly nothing like  that she described, that's unbelievable." As to the garage, he testified, "our garage is pretty messy ... there could have been a broomstick laying out there, I don't know."
A court-ordered custody evaluation report, which was admitted into evidence, indicated that defendant:
[M]ay respond to rebuffs to his self esteem with a wide range of unpredictable behaviors including explosive anger, depression, anxiety and withdrawal. Although he is likely to regain his typical posture of equanimity, he may employ extreme forms of impulsive coping behaviors which may include irresponsible acting out.
At the conclusion of the hearing, the trial court found:
I am satisfied from testimony that this is a volatile situation.... I do accept [the wife's] version of events.
I am satisfied from all the evidence that the issuance or continued possession of the firearms purchaser or identification card by [the husband] would not be in the interest of public health, safety or welfare as that standard is used in N.J.S.A. 2C:58-3. I also believe that under the circumstances and pursuant to N.J.S.A. 2C:25-21, [he] does pose a threat to his wife in these circumstances, and will therefore order forfeiture, or the revocation of his firearms purchaser's identification card. I will also direct that his weapons be forfeited.
The Appellate Division agreed that N.J.S.A. 2C:25-21d(3), authorized seizure of the weapons and firearms purchaser identification card even after the dismissal of the domestic violence complaint. Taking a different view of the facts, however, the Appellate Division concluded that defendant did not pose a risk to public safety or to his ex-wife. Accordingly, the court ordered the return of defendant's weapons and identification card.

*114 III
In the Domestic Violence Act the Legislature made clear its intent to protect victims of actual and potential domestic violence:
It is therefore, the intent of the Legislature to assure the victims of domestic violence the maximum protection from abuse the law can provide.
....
It is the intent of the Legislature to stress that the primary duty of a law enforcement officer when responding to a domestic violence call is to enforce the laws allegedly violated and to protect the victim. Further, it is the responsibility of the courts to protect the victims of violence that occurs in a family or family-like setting by providing access to both emergent and long-term civil and criminal remedies and sanctions, and by ordering those remedies and sanctions that are available to assure the safety of the victims and the public. To that end, the Legislature ... encourages the broad application of the remedies available under this act in the civil and criminal courts.
[N.J.S.A. 2C:25-18.]
Consistent with that general legislative intent, the Act directs that once a domestic violence complaint is filed,
a law enforcement officer who has probable cause to believe that an act of domestic violence has been committed may:
....
upon observing or learning that a weapon is present on the premises, seize any weapon that the officer reasonably believes would expose the victim to a risk of serious bodily injury.
[N.J.S.A. 2C:25-21d(1)(b).]
A gap, however, exists in the Act. Although the broad purpose of the Act is to protect victims, the plain language of N.J.S.A. 2C:25-21d does not expressly permit the court to authorize the prosecutor to retain a defendant's weapons on dismissal of the domestic violence complaint. To illustrate, the first paragraph of N.J.S.A. 2C:25-21d(3) states:
The prosecutor ... may, upon notice to the owner [of the weapons], petition a judge of the Family Part... within 45 days of seizure, to obtain title to the seized weapons, or to revoke any and all permits, licenses and other authorizations for the use, possession, or ownership of such weapons pursuant to the law governing such use, possession or ownership, or may object to the return of such weapons on such *115 grounds as are provided for the initial rejection or later revocation of the authorizations, or on the grounds that the owner is unfit or that the owner poses a threat to the public in general or person or persons in particular.
[N.J.S.A. 2C:25-21d(3).]
By comparison, the fourth paragraph of N.J.S.A. 2C:25-21d(3) mandates the return of weapons if any one of the three following conditions exists:
[I]f the complaint has been dismissed at the request of the complainant and the prosecutor determines that there is insufficient probable cause to indict; or if the defendant is found not guilty of the charges; or if the court determines that the domestic violence situation no longer exists.
[Ibid.]
A strict reading of the fourth paragraph suggests that absent a determination of the domestic violence action adverse to the defendant, the court must order the return of the defendant's weapons. Such a reading would lead to the return of the weapons, even if the court believes the defendant is a threat to the "public in general or a person in particular."
When, however, a statute's plain language would lead to a result contrary to the intent of the Legislature, courts are not confined to a literal reading of that language. State v. State Troopers Fraternal Ass'n, 134 N.J. 393, 401, 634 A.2d 478 (1993). Another part of the first paragraph of N.J.S.A. 2C:25-21d(3), moreover, implicitly refers to N.J.S.A. 2C:58-3, the statute regulating the issuance of firearms purchaser identification cards. In this regard, N.J.S.A. 2C:58-3c(5) provides:
No handgun purchase permit or firearms purchaser identification card shall be issued ... [t]o any person where the issuance would not be in the interest of the public health, safety or welfare.
By reading the two statutes in light of each other, the legislative intent becomes clear. A fundamental tenet of statutory construction is that "every effort should be made to harmonize the law relating to the same subject matter. Statutes in pari materia are to be construed together when helpful in resolving doubts or uncertainties and the ascertainment of legislative intent." State v. Green, 62 N.J. 547, 554-55, 303 A.2d 312 (1973). See also Kimmelman v. Henkels & McCoy, Inc., 108 N.J. 123, 129, 527 A.2d *116 1368 (1987) (stating "[i]n discerning [legislative] intent we consider not only the particular statute in question, but also the entire legislative scheme of which it is a part"); New Jersey Builders, Owners, & Managers Ass'n v. Blair, 60 N.J. 330, 338, 288 A.2d 855 (1972) (stating "[i]n reading and interpreting a statute, primary regard must be given to the fundamental purpose for which the legislation was enacted").
When read together, the two statutes reflect the legislative intent that a court should not return weapons to a defendant who is a threat to the public health, safety, or welfare. The contrary result  the return of weapons to a defendant who is a threat to the public  would be an invitation to a tragedy. We doubt that the Legislature would have intended so disastrous a result.
As we read the statutes, the Legislature intended that a court should have the power and the responsibility to retain weapons on determining that the owner of those weapons is a threat "to public health, safety or welfare." N.J.S.A. 2C:58-3(c); N.J.S.A. 2C:25-21d(3). Weapons seized and retained under these circumstances should be "sold and the proceeds given to the defendant or the guns can be transferred at defendant's request to someone who qualifies as a purchaser under N.J.S.A. 2C:58-1 et seq. and has an appropriate permit or card authorizing the acquisition." State v. Cunningham, 186 N.J. Super. 502, 513, 453 A.2d 239 (App.Div. 1982). We agree with the lower courts that the Legislature intended that courts not return guns to a defendant in a domestic violence action, even after the dismissal of the complaint, if the court finds that the defendant poses a threat to public health, safety, or welfare.

IV
Although the lower courts agreed on the interpretation of the relevant statutes, they disagreed on the ultimate issue whether defendant posed a threat to public safety. Ordinarily, an appellate court should accept a trial court's findings of fact that are supported by substantial credible evidence. Bonnco Petrol, *117 Inc. v. Epstein, 115 N.J. 599, 607, 560 A.2d 655 (1989). Deference to a trial court's fact-findings is especially appropriate when the evidence is largely testimonial and involves questions of credibility. Ibid. Thus, an appellate court should not disturb a trial court's fact-findings unless those findings would work an injustice. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-84, 323 A.2d 495 (1974). Consequently, "an appellate court should exercise its original fact finding jurisdiction sparingly and in none but a clear case where there is no doubt about the matter." Id. at 484, 323 A.2d 495. If, however, an appellate court is reviewing a trial court's legal conclusions, the same level of deference is not required. Manalapan Realty v. Township Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995).
In finding that defendant was a threat to public health, safety, or welfare, the trial court stated:
I am satisfied from testimony that this is a volatile situation. It has been a, regrettably, a very, very bitter divorce, it's been ongoing for not only months, but years, I guess, at this juncture. There have been numerous confrontations, not necessarily physical but ongoing, ... With reference to the specific acts referred to today, I do accept [S.D.'s] version of events. I am satisfied that he did gerryrig out these weapons, booby traps, or what were supposed to appear as booby traps. He [was] most equivocal in his testimony about the stick-it or Post-it notes. I am satisfied that they were there with messages, if not identical but substantially similar to what [S.D.] described. The behavior of this  I am satisfied her version of events with this record playing and practicing a draw or whatever did in fact take place. Much of this behavior borders on frankly, the bizarre. The psychological evaluation speaks for itself, although I will note that the one that is referred to was court ordered. I've also reviewed the letters that have been submitted by the State and certainly they're not dispositive of the issue, but they're certainly not inconsistent with the psychological evaluation and are of concern.
In disagreeing, the Appellate Division focused on different considerations. It stated:
[J.W.D.] is employed as a chemical engineer and supervisor. He is also a Commander in the Naval Reserves and served on active duty in Vietnam. Understandably, the local police had no objection to the return of the weapons. He does not have a criminal record; was never convicted of a crime; is not presently under indictment; has never been diagnosed as drug dependent; has never been hospitalized for a mental or emotional disorder; has never experienced seizures or other convulsive disorders; and does not suffer from any physical ailment as would prevent his safe handling of weapons. See N.J.S.A. 2C:58-3.

*118 [290 N.J. Super. at 461, 676 A.2d 138.]
The Appellate Division also noted that defendant had possessed the weapons during the two years between the domestic violence complaints when the "domestic tension and divorce action were at a critical stage." Id. at 462, 676 A.2d 138. The court then indicated that the trial court's findings amounted only to an acceptance that certain activities took place, not that J.W.D. was a threat to his ex-wife or the general public. Ibid. In addition, the court pointed out that the psychological report did not "state that [J.W.D.] would resort to physical violence or use of weapons." Ibid. With regard to J.W.D.'s letters to the prosecutor's office, the Appellate Division "perceive[d] [them] to merely reflect his displeasure and frustration under the circumstances." Ibid. As a result, the court concluded that "there was insufficient credible evidence to support the judge's order of forfeiture." Ibid.
The lower courts reached conflicting conclusions by emphasizing different facts. Under the circumstances, we believe that the better approach is to remand the matter to the Family Part to reconsider whether the defendant poses a threat to public health, safety, or welfare. The Family Part may take such additional testimony as it, in its discretion, deems appropriate. In remanding, we recognize that the witnesses' credibility played a large part in the Family Part's original findings. We do not intimate that the Family Part should change its original decision.
The judgment of the Appellate Division is affirmed in part, reversed in part, and the matter is remanded to the Family Part.
For affirmance in part; reversal in part; remandment  Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN  6.
Opposed  none.