# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0604-19T4

DANIEL L. VARGAS,

     Plaintiff-Appellant,

v.

MEGHAN M. STRNAD,

     Defendant-Respondent,

_____

Submitted August 25, 2020 – Decided  September 9, 2020

Before Judges Alvarez and Gooden Brown.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FD-09-1613-19.

Franz Cobos, attorney for appellant.

Respondent has not filed a brief.

PER CURIAM

     In this non-dissolution matter, plaintiff-father appeals from the September 13, 2019 Family Part order entered following a plenary hearing,

finding that he consented to defendant-mother relocating to Pennsylvania with their then four-year-old son within the meaning of N.J.S.A. 9:2-2. We affirm.

We glean these facts from the record. The parties are unmarried and have a son born December 6, 2014, while they were living together. After they separated and ceased cohabitating, the parties agreed to a parenting schedule whereby defendant had residential custody and would have their son "Monday through Friday," and plaintiff "would have parenting time" on weekends "from Friday afternoon until Sunday evening."

On May 20, 2019, plaintiff filed a complaint for residential custody on the ground that defendant relocated to Pennsylvania with their son without his consent. In support, plaintiff certified that the parties had resided together in Bayonne, New Jersey, until July 2018, when defendant moved to South Jersey with their son. In January 2019, plaintiff learned that defendant was relocating to Pennsylvania with their son and her new husband. Plaintiff stated he "told [defendant] that she did not have [his] consent" to relocate with their son, but took no further action until the filing of his complaint.

Plaintiff continued that months later, on May 14, 2019, defendant was "hysterical on the phone" and informed him that she and "her husband . . . had been fighting for the last three days." Based on her words and her text

messages, in which defendant purportedly admitted "to . . . ongoing domestic violence with her husband," plaintiff inferred that defendant's husband was "verbally and possibly physically abusive." In addition, defendant advised plaintiff that because she had no food in the house, and was facing possible "eviction" from being "three months late on her rent," she planned "to now relocate to Virginia with [their son]." Plaintiff explained that he was now seeking a change in residential custody because of defendant's "ongoing domestic violence, homelessness, and . . . transient living conditions."

The parties appeared on June 19, 2019, at which point defendant, who was representing herself, advised the judge that she intended to file a relocation application. [1] The judge granted plaintiff residential custody, pending the submission of defendant's application to relocate with their son to Pennsylvania. After the relocation application was filed, the judge scheduled a plenary hearing which was conducted on September 13, 2019.

At the hearing, defendant testified that in January 2019, before she relocated to Pennsylvania with their son, she called plaintiff and requested an "in[-]person" meeting. At the meeting, she told plaintiff that she and her new husband "found . . . property [they] were lease/purchasing" in Pennsylvania.

---

[1] Defendant did not file a responding brief in this appeal.

According to defendant, plaintiff responded, "I don't like it, but there's nothing I can do. Congratulations."

Initially, defendant testified that the in-person meeting occurred at "a Dunkin' Donuts off of Exit 12 on Route 80" in "the Blairstown area" where they conducted their parenting time exchanges. However, on cross-examination, defendant acknowledged she was mistaken. Defendant testified that because she was living in Ocean County in Barnegat at the time, and plaintiff was living in Bayonne, the in-person meeting "was, most likely, . . . either in Bayonne or down in Barnegat," but she could not "recall which location." Regarding plaintiff's consent, defendant also acknowledged on cross-examination that "to be very technical[,] the word 'yes' did not leave [plaintiff's] mouth." However, "he also never said no."

Defendant testified that after the meeting, she moved around "the end of January" and they "continued [their] normal parenting [time] schedule." Defendant stated "there was no issue" until Friday, May 17, 2019, when she "brought [their son] to Bayonne for his regular visit with [plaintiff]." She explained that two days later, on Sunday, when she went to the "[e]mergency [r]oom" with "food poisoning," plaintiff agreed that "[their son] could stay

4

[with him] until Monday." However, on Monday, "[plaintiff] told [her] that he was not giving [her their son] back until [they] came to court."

Defendant believed plaintiff filed the application because "just after Mother's Day," she and her husband had "gotten into an argument" over "bills" and "finances." Because she "didn't want [her] children in the house while [they] were arguing," she had asked plaintiff to pick up their son, as well as her older nine-year-old son from a different relationship. Defendant vehemently denied that the argument with her husband "was a domestic violence incident." She explained that she had been "through [her] share of very abusive relationships," including her relationship with plaintiff, and, as a result, "tend[ed] to get very upset" whenever "there's yelling involved."

Defendant testified that although she and her husband resolved their differences, during her conversation with plaintiff, she indicated that she would have to move to Virginia where her mother lived if things did not work out with her husband. Defendant said plaintiff was afraid that she was going to run away to Virginia with their son and he would never see him again. Additionally, plaintiff was concerned that her "husband was doing something wrong to [her] or the children." However, defendant produced a letter from

5

the Division of Child Protection and Permanency essentially indicating that their investigation resulted in no adverse findings.

In contrast, plaintiff testified that on January 17, 2019, defendant notified him about her move to Pennsylvania during "a ten-minute long [telephone] conversation" that occurred "while [he] was at work." Plaintiff testified that "[he] was fine with wherever she wanted to go" but he did not consent to their son relocating to Pennsylvania. During his testimony, plaintiff produced a recording of a May 14, 2019 telephone conversation between himself and defendant,[2] during which he expressed concern about returning their son to defendant because he "heard [defendant and her husband] yelling at each other." During the conversation, defendant acknowledged that she and her husband were "arguing" but insisted that their son would be "fine" in her home.

Plaintiff also produced the text message exchange between himself and defendant that he had submitted with his moving papers,[3] to show that the verbal dispute in defendant's home had been ongoing for at least three days. Although plaintiff acknowledged that because of his work schedule, his

---

[2] The recording was played in court and admitted into evidence.

[3] The text message exchange was also admitted into evidence.

A-0604-19T4

girlfriend had to assist him in caring for his son, given the "[d]omestic disturbances at [defendant's] home," plaintiff believed that his son residing with him was "in his [son's] best interests."

Following the hearing, the judge credited defendant's testimony over plaintiff's, and made the following factual findings:

> At the time of the operative incidents here [the parties' son] was living with [defendant], first in Barnegat, and then in Pennsylvania . . . .
>
> [Defendant] testified that she discussed the relocation with [plaintiff]. That was more than the [ten]-minute phone call that [plaintiff] described. . . . [Defendant's] testimony did change from first saying [the meeting] was [at] a Dunkin' Donuts on [R]oute 80 and then when she realized that she was living in Barnegat at the time she said it took place somewhere else, either in Barnegat or in Bayonne, she didn't remember where. But she continued to testify that [plaintiff's] response was to say he didn't like it, but good luck.
>
> It is undisputed that then for the next four months [plaintiff] knew that [defendant] and [their son] were living in [Pennsylvania]. That he and [defendant] had worked out an arrangement whereby on Fridays [plaintiff] or his girlfriend would pick [his son] up at . . . the Dunkin' Donuts on Route 80 and return him there on Sunday. That continued until the incident in May.
>
> The recording . . . . did have the audio of a rather heated argument between [defendant] and her husband. [Defendant], to her credit, did not want to

A-0604-19T4

expose [their son] to that, and asked [plaintiff] to come and pick him up and take him with him for a while. [Plaintiff] then used that as a pretext to file this complaint seeking to have custody handed to him on the grounds that [defendant] moved him out-of-state without his consent.

The judge then recited the provisions of N.J.S.A. 9:2-2, governing parents' removal of children from New Jersey, and prescribing that children of separated parents "shall not be removed" from the State while under the age of consent "without the consent of both parents, unless the court, upon cause shown, shall otherwise order." The judge continued that here,

> [a]lthough [plaintiff] may not ever have said yes, [he] certainly acquiesced in [defendant's] moving to Pennsylvania with [their son]. [He e]ntered into an arrangement with her for visitation on weekends which, again, is undisputed. And, apparently, there were no incidents until the one in May where [defendant] and her husband got into the argument.

Based on his factual findings, the judge concluded that plaintiff "consented within the meaning of [N.J.S.A. 9:2-2]" to defendant relocating with their son to Pennsylvania. Thus, according to the judge, "[t]he analysis required under [Bisbing v. Bisbing, 230 N.J. 309 (2017)[4] was] of no moment

---

[4] See Bisbing, 230 N.J. at 338 (holding that in the absence of parental consent, modifications of custody based on permanent relocation is "governed by N.J.S.A. 9:2-2," requiring plaintiff to "demonstrate that there is 'cause' for an order authorizing such relocation" and evaluating "cause" based on "a best

here," since, under the statute, that only "applie[d] . . . if the parents do not consent." The judge also found that plaintiff "has not shown that there is any basis for removing custody from [defendant]." Accordingly, the judge entered an order granting the parties joint legal custody, defendant residential custody, and providing that visitation would continue under the parties' previously agreed upon plan. This appeal followed.

On appeal, plaintiff argues the judge erred in finding that he "consented to the child's relocation to Pennsylvania despite [his] denial of such consent and [defendant's] inconsistent testimony of such consent." According to plaintiff, because the judge's decision "was not supported by the record, . . . . [defendant] should be required to show cause for her relocation to Pennsylvania." We disagree.

"The scope of our review of the trial judge's findings of fact is limited." Dever v. Howell, 456 N.J. Super. 300, 309 (App. Div. 2018) (citing Cesare v. Cesare, 154 N.J. 394, 411 (1998)). "We will not reverse if on appeal the record supports the judge's factual findings by adequate, substantial, and credible evidence." Ibid. (citing Cesare, 154 N.J. at 411-12). "Deference is especially appropriate 'when the evidence is largely testimonial and involves

interests analysis in which the court will consider all relevant factors set forth in N.J.S.A. 9:2-4(c), supplemented by other factors as appropriate.").

questions of credibility.'" Cesare, 154 N.J. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)).

Indeed, "[b]ecause a trial court hears the case, sees and observes the witnesses, [and] hears them testify, it has a better perspective than a reviewing court in evaluating the veracity of witnesses." Ibid. (alterations in original) (citations and quotation marks omitted). Moreover, "[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to [the judge's] fact[-]finding." Cesare, 154 N.J. at 413.

"Although we defer to the judge's findings of fact when supported by sufficient evidence, we owe no deference to the judge's decision on an issue of law or the legal consequences that flow from established facts." Dever, 456 N.J. Super. at 309 (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). Nonetheless, "an appellate court should not disturb the 'factual findings and legal conclusions of the trial judge unless [it is] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)).

Guided by these deferential principles and our review of the record, notwithstanding plaintiff's arguments to the contrary, we have no reason to disturb the judge's findings of fact or conclusions of law. The judge's factual findings are supported by adequate, substantial, and credible evidence in the record, and his legal conclusions are sound.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0604-19T4