# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2080-23

IN THE MATTER OF
G.B.M., II.

_____

Submitted May 6, 2025 – Decided May 15, 2025

Before Judges Chase and Vanek.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket No. FO-01-0275-23.

Nicholas A. Moschella, Jr., LLC, attorney for appellant G.B.M., II (Nicholas A. Moschella, Jr., on the brief).

William Reynolds, Atlantic County Prosecutor, attorney for respondent State of New Jersey (Courtney M. Cittadini, Chief Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

G.B.M.[1] appeals from an order entered in the Family Part on January 31, 2024, requiring him to forfeit his weapons that had been seized by law

---

[1] We employ initials to identify the victim to protect their privacy. R. 1:38-3(d)(9).

enforcement authorities pursuant to a temporary restraining order ("TRO") entered against him under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35 ("PDVA") and revoking his Firearms Purchaser Identification Card ("FPIC"). We affirm.

I.

On April 19, 2022, the Egg Harbor Township Police Department served a TRO on G.B.M. As a result of the TRO, G.B.M.'s .40 caliber handgun, a Ruger 5.256 rifle, and a firearms purchaser identification card were seized. The TRO was later dismissed.

The Atlantic County Prosecutor's Office received notification of the seizure on December 19, 2022, and on February 13, 2023, the State moved to forfeit the firearms and the FPIC under N.J.S.A. 2C:25-21(d)(3), N.J.S.A. 2C:58-3(c)(5) and (f), and 18 U.S.C. § 922(g)(4).

The matter was tried over two days in 2023. The State called three witnesses. G.B.M. and his mother testified on his behalf. The parties stipulated to admit into evidence certain medical records of G.B.M.

J.P. testified first for the State. J.P. worked for the Ocean City Police Department ("OCPD") for twenty-four years and was the parking enforcement supervisor. She testified that G.B.M. was one of her parking officers and in

2018 another parking officer, A.G. complained that G.B.M. was stalking and harassing her. After an investigation revealed that G.B.M. would go out of his zone, follow A.G. around town, show up unannounced at her car, and was once found on the street where she lived, G.B.M. was told that he would be terminated. G.B.M. asked if he could resign instead, and he was allowed to do so. The court deemed her testimony credible.

A.G. testified that was employed for two summers at the OCPD, working with G.B.M. during the summer of 2018. A.G. testified that she had made it clear to G.B.M. that she had no romantic interest in him. Regardless, he pursued her. In turn, she told him to stop, but he did not. A.G. noted that when she would come in early or leave late to avoid G.B.M., he always was there watching her. She also testified that there was no reason for G.B.M. to be in locations where she was, but he kept appearing, so she eventually reported him for stalking and harassment. The court accepted her testimony as credible.

The State also called R.R. who dated G.B.M. for two years before their relationship ended in 2020. She testified that they filed cross TROs in 2022, but both were dismissed when they agreed to civil restraints. R.R. testified G.B.M. would become intoxicated and engage in dangerous behavior, such as driving or

A-2080-23

playing with firearms. R.R. further testified that while drinking, G.B.M. would be increasingly aggressive, depressed, violent and threatening.

According to R.R., G.B.M. would strike her about once a month while intoxicated. She also related other incidents where G.B.M. almost threw her down a set of stairs and slammed doors on her hands and in her face. She testified that once, G.B.M. was in his garage cleaning his loaded firearms, and pointed a gun at her and various objects in the garage. When R.R. asked G.B.M. to put the gun away, he told her to stop being a baby. R.R. also testified to an incident during which an intoxicated G.B.M. held her head underwater for approximately twenty to thirty seconds while they were in a swimming pool.

R.R. testified that on one occasion G.B.M. threatened to kill himself. According to R.R., G.B.M. pulled out a noose from under his bed and told R.R. he was a rapist, that he deserved to die, and that the world would be a better place without him. G.B.M. then grabbed R.R.'s arm so hard that it left bruises. Concerned, R.R. texted G.B.M.'s father and told him that G.B.M. was refusing to take his antipsychotic medication and that "he needed more help than any of us could give him."

R.R. also testified to G.B.M.'s threats of violence toward others. She explained that he sent her a list of approximately twelve people—called the

4

"Woodchipper List"—that he wanted to kill and put in a woodchipper. The list was comprised of past and present coworkers, including A.G., as well as G.B.M.'s mother, sister, himself, R.R.'s ex-boyfriend, school officials, a police lieutenant, and a police captain.

Lastly, R.R. testified to two instances of sexual violence, the first of which occurred on November 6, 2020. R.R. recounted that she had been at G.B.M.'s house when he became aggressive. She locked herself in his room and texted him, telling him she wanted to go home, and she felt uncomfortable. G.B.M. told her to come out, have a drink and calm down; R.R. agreed. Soon after consuming a few shots of liquor, R.R. became unconscious. When she awoke, R.R. was nude and G.B.M. was performing oral sex on her. R.R. testified she was unable to open her mouth or move her body. R.R. testified she was "so out of it," she lost control of her bladder and was unable to walk. She collapsed on the floor; he left her, still nude, lying on the floor.

Four days later, on November 10, 2020, G.B.M. cornered her in his bedroom and sexually assaulted her. R.R. told him to get off her, but he later claimed to not hear her and "to be hallucinating due to mental illness." When R.R. told him she was leaving him, he told her he "has two bullets and a bullseye," which she took to mean a bullet for each of them. R.R. reported the

5

sexual assaults in December of 2021 to Egg Harbor Township Police Department. Criminal charges were not filed.

On cross examination, R.R. admitted that she did not report the alleged sexual assault until February 4, 2022. She further admitted that during an interview she told the Egg Harbor Township police she had six shots, not two or three. R.R. also stated she had seen a gynecologist after the sex assault and acknowledged she had not reported that G.B.M. pointed a gun at her.

The court recognized there were some inconsistencies in R.R.'s testimony but found her to be generally credible. When viewing the other evidence, the court determined her testimony was consistent in nature and theme with the testimony of J.P. and A.G. The court stated that it appeared R.R. was a victim in the throes of the cycle of domestic violence from G.B.M. and accepted her testimony.

K.M., G.B.M.'s mother, testified that R.R. and her son were in a dating relationship for approximately two years and that R.R. was at K.M.'s residence from Monday through Saturday during that time. K.M. acknowledged that G.B.M. and R.R. had relationship issues, and she characterized R.R. as controlling. K.M. was not aware of the sexual assault allegations. She also

6

testified to some of R.R.'s issues. The court determined her testimony was credible.

The parties also stipulated to the admissibility of G.B.M.'s medical records. The records reveal he consistently sought mental health treatment. The records contained evidence that G.B.M. saw a mental health provider in 2021 and spoke about having suicidal ideation in 2020. The records also indicated G.B.M. had a history of depression, anxiety, past trauma, ADHD, and more. He also had been prescribed various mental health medications and advised that he had tried multiple antidepressants in the past. G.B.M. also admitted to heavy drinking in the past and acknowledged that he needed mental health treatment and "appeared motivated for mental health out-patient treatment."

The court determined the medical records corroborated R.R.'s testimony and timeline about G.B.M.'s threat to kill himself with a noose. In fact, later in the report, G.B.M. was noted to have had a separate, previous suicide attempt a year before when he tied a noose but never put it around his neck. Moreover, the court noted that the records disclosed that during his youth, G.B.M. would bang his head in frustration for self-injurious behavior.

G.B.M. testified and characterized A.G.'s allegations as inconsistent, but did not elaborate. He also testified that he was called by a supervising officer,

7

in July 2018, and advised that if he tried to contest the allegations then it would get worse. He stated he was given the choice to contest the allegations and possibly be terminated or to resign. He stated that he chose to resign. The court found his testimony regarding A.G. to be relatively short and conclusory in nature.

G.B.M. also acknowledged that he and R.R. had a romantic relationship and stated that there were no criminal charges filed against him as a result of the relationship. He further testified that there were cross TROs filed, but both were dismissed. The court found that G.B.M. confusingly testified that R.R. had made allegations against another gentleman, but then testified that the other man had pled guilty to and was sentenced to a period of incarceration for sexual assault and stalking R.R.

G.B.M. also testified that he was granted a firearms license and FPIC in February 2019 and on his application, he answered "no" as to any mental health problems and/or treatment. G.B.M. acknowledged that he had been diagnosed by that time and had gone to counseling, so that answer was untrue. Overall, the court found his testimony was short and conclusory and that he did not testify in a careful, thoughtful, and deliberate manner. The court found the testimony he provided was either incomplete, inaccurate, or dishonest. The court

A-2080-23

mentioned that G.B.M. did not dispute and provided no details as to the alleged physical and sexual assault and other abuse testified to by R.R. By not addressing the allegations, the court determined that it was left only with R.R.'s unrebutted testimony, which the court found credible. The court then inferred that the allegations were not addressed or rebutted by G.B.M. because they happened. Moreover, the court found his testimony was inconsistent with his intake interview in his medical records in which he recounted his issues and need for treatment.

On January 31, 2024, the court determined that the State filed its forfeiture petition out of time, and it was therefore statutorily time-barred from seeking forfeiture of appellant's FPIC and firearms under the PDVA. The court found, however, that the State alternatively filed to revoke appellant's FPIC and forfeit his weapons under N.J.S.A. 2C:39-58(c)(5) and N.J.S.A. 2C:58-3(f), so it could proceed under those statutes. The court then concluded that the State proved by a preponderance of the evidence that G.B.M. was disqualified from possessing an FPIC, a permit to purchase a firearm ("PPH"), and firearms under the public health, safety and welfare disqualifier. The court also concluded that G.B.M. falsified his application. The court reasoned that G.B.M. did in fact suffer from some mental disease and/or defect, and was otherwise unfit to purchase, own or

possess firearms, as there was more than sufficient evidence to support all claims thereof. The court ordered that G.B.M. forfeit his FPIC and firearms and provided him with sixty days to arrange for the sale or transfer of his property through a federally licensed firearms dealer.

On appeal, G.B.M. argues:

POINT ONE

THE COURT PROPERLY RULED THE STATE WAS STATUTORILY BARRED FROM SEEKING FORFEITURE UNDER THE PREVENTION OF DOMESTIC VIOLENCE ACT BUT IMPROPERLY GRANTED THE PETITION.

POINT TWO

THE COURT ERRED IN RULING THE STATE MET ITS BURDEN IN GRANTING THE PETITION TO FORFEIT WEAPONS PURSUANT TO 2C:58-3(c)&(f) AND 18 U.S.C. § 922(g) AGAINST THE WEIGHT OF EVIDENCE.

POINT THREE

THE COURT IMPROPERLY FOUND APPELLANT FALSIFIED THE FPIC APPLICATION.

II.

An appellate court's review of a "trial court's legal conclusions regarding firearms licenses [is] de novo." In re N.J. Firearms Purchaser Identification Card by Z.K., 440 N.J. Super. 394, 397 (App. Div. 2015). However, "[w]hen

10

evidence is testimonial and involves credibility questions, deference is 'especially appropriate' because the trial judge is the one who has observed the witness first-hand." In re D.L.B., 468 N.J. Super. 397, 416 (App. Div. 2021) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). We therefore must accept the trial court's findings if they are supported by substantial credible evidence. In re Return of Weapons to J.W.D., 149 N.J. 108, 116-17 (1997). As such, we "will not disturb a trial court's findings unless they 'went so wide of the mark that the judge was clearly mistaken,'" D.L.B., 468 N.J. Super. at 416 (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)), or "unless those findings would work an injustice." J.W.D., 149 N.J. at 117.

### III.

G.B.M. first contends that since it failed to file its petition within forty-five days of the seizure as is required by the PDVA, the court should not have allowed the forfeiture hearing to proceed. We disagree. N.J.S.A. 2C:25-21(d)(3) does not address eligibility to possess a weapon or a permit; it deals only with the disposition of seized weapons under the PDVA. State v. G.P.N., 321 N.J. Super. 172, 177 (App. Div. 1999).

The eligibility to possess a weapon or a permit is controlled by N.J.S.A. 2C:58-3(c), which states that a permit is void at any time upon the finding that

11

the permit holder is subject to any of the disabilities enumerated in the statute, including that the issuance of the permit would not be in the interest of the public safety, health, or welfare. Thus, the permit may be revoked anytime upon a finding that the permit holder no longer qualifies for the permit. G.P.N., 321 N.J. Super. at 176-77.

The PDVA does not create a time bar precluding the State from enforcing the provisions of the permit statute, and the forfeiture was therefore proper. See J.W.D., 149 N.J. at 114-16 (reading the permit statute in pari materia with the PDVA to authorize the prosecutor to retain seized weapons after the domestic violence complaint is dismissed where the court finds defendant is a "threat to the 'public in general or a person in particular'" even though N.J.S.A. 2C:25-21(d) does not so provide); State v. Cunningham, 186 N.J. Super. 502, 511 (App. Div. 1982) (holding that after police lawfully seize a firearm, returning it "to its owner at a time when the owner would be disqualified from obtaining a permit to acquire the firearm constitutes a transfer that is prohibited by the statute").

Next, G.B.M. posits the court's finding that he should be disqualified from possessing an FPIC, PPH, and firearms under the public health, safety, and welfare disqualifier was against the weight of the evidence. That argument is unpersuasive and does not require extended discussion. With the admission and

12

reliance on G.B.M.'s own medical records, it is clear that the trial court's decision was based on sufficient evidence. Additionally, the credible testimony of the State's three witnesses supports the court's determination that G.B.M. should be disqualified from possessing a firearm. We cannot substitute our findings for those made by the trial court when supported by substantial credible evidence in the record as a whole. J.W.D., 149 N.J. at 116-17.

Lastly, G.B.M. contends that although he admitted to falsifying his FPIC certification on cross examination, the court improperly revoked his FPIC because this was not alleged in the State's certification to forfeit his weapons. This argument lacks merit. N.J.S.A. 2C:58-3(c)(3) provides that an FPIC or PPH shall not be issued to an applicant "who knowingly falsifies any information on his application form . . . . " "[I]nvoking FPIC/PPH disqualification when any falsification is tendered is consistent with the application's underlying function, which is to provide information to facilitate the police chief's background investigation." In re Appeal of the Denial of R.W.T., 477 N.J. Super. 443, 469 (App. Div. 2023) (emphasis in original). Further, "an FPIC/PPH application that includes a knowing falsehood is disqualified at the moment it is filed and cannot be rehabilitated by an admission made later . . . . " Id. at 473.

A-2080-23

Here, G.B.M. knowingly made a falsification on his application, which would have been a categorical bar to his application. In so doing, he deprived the police of an opportunity to investigate his mental health claims and determine if his mental health history should have prevented the issuance of an FPIC. There was no way the State could know this information until G.B.M. admitted on the stand that he knowingly falsified his application. In short, the court properly determined that he knowingly falsified his application, warranting disqualification from obtaining an FPIC.

To the extent we have not otherwise addressed G.B.M.'s arguments, they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2080-23