# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2981-23

N.A.M.,[1]

    Plaintiff-Respondent,

v.

A.M.,

    Defendant-Appellant.

_____

        Submitted April 28, 2025 – Decided May 23, 2025

        Before Judges Gummer, Berdote Byrne, and Jacobs.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FV-07-2205-24.

        Rozin Golinder Law, LLC, attorneys for appellant (Kristen N. Epifania, on the brief).

        Respondent has not filed a brief.

PER CURIAM

---

[1] We use initials and pseudonyms to protect the parties' privacy and the confidentiality of these proceedings. R. 1:38-3(d)(10).

A.M. ("Arnie" or "defendant") appeals from the Family Part's April 23, 2024 decision issuing a final restraining order ("FRO") against him.  The trial court found defendant had committed the predicate act of harassment against his former spouse, N.A.M. ("Naomi"), when he sent her several emails in December 2023 in violation of two court orders limiting his contact with her.  Although defendant submits several arguments on appeal challenging the substantive merits of this case and alleging he was denied a full and fair hearing, we find these arguments without merit and affirm.

I.

Naomi and Arnie were married until their divorce in 2010.  The former spouses have two children, A.M.[2] and W.M. ("Wendy"), a minor.  Arnie has not had parenting time with Wendy since 2018 by court order, and there are two relevant orders filed in the dissolution docket regarding Arnie's contact with Wendy and Naomi:  (1) a court order entered on March 15, 2023, provides Arnie shall have access to Wendy's school portal and physician information so he may be informed of Wendy's educational and medical needs ("March Order"); and (2) a consent order entered on September 5, 2023, provides Arnie and Naomi's respective contact with one another is to be strictly limited to email unless in an

_____

[2]  At all times relevant to this appeal A.M. was emancipated.

emergency, all communications with one another are to be limited to Wendy's education and medical issues, and Arnie may send Naomi one email per week and must allow Naomi three business days to respond unless in an emergency ("September Order").

Naomi sought and received a temporary restraining order ("TRO") on December 25, 2023, alleging Arnie had sent harassing emails to her throughout December 2023. At the FRO hearing, Naomi testified the March and September Orders were necessitated by a prior history of harassing communications she had received from Arnie. Specifically, Naomi testified she had received over twenty emails from Arnie during December 2023, culminating in a December 25, 2023 email in which he informed her of his intention to visit her and Wendy to deliver Wendy a Christmas gift. Naomi testified she had received additional messages that day in which Arnie accused her of triggering his post-traumatic stress disorder ("PTSD") and allegedly making his life miserable.

Naomi also testified to an incident at Beth Israel Hospital in Newark occurring before the December 25, 2023 email in which Arnie was escorted out of the hospital by staff due to his behavior when he complained of an alleged lack of communication from doctors as to Wendy's routine medical appointment. Additionally, Naomi testified regarding an email Arnie had sent on December

3

23, 2023, demanding she provide information about Wendy's mental health. When Naomi responded by directing Arnie to ask Wendy's doctors directly as set forth in the March Order authorizing his access to all of Wendy's physicians, he responded with a follow-up email stating, "don't you ever tell me to ask others for information on [Wendy].  I will ask you and you will provide."

Regarding prior acts of domestic violence, Naomi testified Arnie had filed numerous, frivolous, post-divorce motions, such as motions requesting Naomi undergo a psychiatric evaluation.  Naomi also testified, in October 2023, police had responded to her home for a wellness check after Arnie called police and claimed Naomi and Wendy were mentally ill and not taking their medication. Naomi then testified to an incident in February 2023 where, during a post-divorce hearing, Arnie appeared in court wearing a shirt with Naomi's, Naomi's husband's, and Wendy's face on it, and sat next to Naomi and her husband.  The trial court found Naomi's testimony credible.

Arnie—who had originally been represented but proceeded pro se in the middle of this litigation—also testified, stating his emails to Naomi were focused on Wendy's health and medical updates.  He further testified he did not have adequate information as to Wendy's medical issues, and Wendy's doctors and school did not provide him with satisfactory information about Wendy's

medical and educational needs. The trial court found Arnie to be "mostly, but not completely, credible" because, among other things, he had "testified the emails were about [Wendy's] health, but the emails speak for themselves, and they were not exclusively about [Wendy's] health."

Relying on the parties' respective testimony regarding the prior history of domestic violence as well as the March and September Orders, the trial court entered an FRO against defendant, finding the predicate act of harassment, and determining an FRO was necessary after analyzing the factors enumerated in N.J.S.A. 2C:25-29 (a)(1) to (7). This appeal followed.

## II.

"Our review of an FRO is generally limited." T.B. v. I.W., 479 N.J. Super. 404, 412 (App. Div. 2024). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" Ibid. (quoting C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020)). Accordingly, we defer to the trial court's findings of fact as long as they are "supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of

credibility.'" Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). As such, "[w]e do not disturb a court's findings unless those findings are 'so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice.'" T.B., 479 N.J. Super. at 412 (quoting Cesare, 154 N.J. at 412). However, the trial judge's conclusions of law are not awarded the same level of deference and we review such conclusions de novo. Ibid.

On appeal, defendant raises six issues: (1) the trial court's order is not supported by adequate, substantial, credible evidence in the record; (2) the trial court erred in finding a predicate act of harassment because defendant possessed neither the requisite purpose nor intent to harass Naomi; (3) defendant was deprived of his "fundamental due process" because the trial court failed to inquire about his ability to retain new counsel and did not inquire as to whether he "understood the implications of proceeding as a pro se litigant"; (4) the trial court did not afford defendant a full and fair hearing; (5) the trial court impermissibly permitted defendant's original trial counsel to "abruptly withdraw from the proceedings during trial"; and (6) the trial court erred in finding an FRO was necessary. These issues went unanswered by Naomi, as her counsel

filed a letter to the court on her behalf advising she would not participate in this appeal.

When determining whether to issue an FRO pursuant to the Prevention of Domestic Violence Act ("PDVA"), N.J.S.A. 2C:25-17 to -35, a court must make two distinct determinations. Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). First, the court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. Second, if a court finds a predicate act occurred, "the judge must determine whether a restraining order is necessary to protect the plaintiff from future danger or threats of violence." D.M.R. v. M.K.G., 467 N.J. Super. 308, 322 (App. Div. 2021).

N.J.S.A. 2C:25-19 provides several enumerated offenses which may amount to predicate acts of domestic violence. Included in this enumerated list is harassment. J.D. v. M.D.F., 207 N.J. 458, 485 (2011). "Harassment" is defined, in pertinent part, as

> a petty disorderly persons offense if, with purpose to harass another, [the individual]:
>
> a. Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse

language, or any other manner likely to cause annoyance or alarm;

. . .

c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

[N.J.S.A. 2C:33-4.]

"Drawing the line between acts that constitute harassment for purposes of issuing a domestic violence restraining order and those that fall instead into the category of 'ordinary domestic contretemps' presents our courts with a weighty responsibility and confounds our ability to fix clear rules of application." J.D., 207 N.J. at 475 (citation omitted) (quoting Corrente v. Corrente, 281 N.J. Super. 243, 250 (App. Div. 1995)). Therefore, conduct "would only qualify as a predicate act [of harassment] if it were both committed with a purpose to harass and if the act was 'likely to cause annoyance or alarm.'" Id. at 485 (quoting N.J.S.A. 2C:33-4(a)); see also D.M.R., 467 N.J. Super. at 323 ("Harassment requires the defendant act with the purpose of harassing the victim." (citing J.D., 207 N.J. at 486)); S.B.B. v. L.B.B., 476 N.J. Super. 575, 597 (App. Div. 2023) ("[P]urpose to harass is critical to the constitutionality of the harassment offense." (quoting R.G. v. R.G., 449 N.J. Super. 208, 226 (App. Div. 2017))),

certif. denied and appeal dismissed, 256 N.J. 434 (2024). "'"A finding of a purpose to harass may be inferred from the evidence presented" and from common sense and experience,'" D.M.R., 467 N.J. Super. at 323 (quoting H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003)), and we "consider the evidence in light of whether there is a previous history of domestic violence" between the parties, Silver, 387 N.J. Super. at 126.

Here, the predicate act of harassment was satisfied by the numerous emails defendant sent to Naomi in December 2023, in direct violation of the September Order, which strictly limited the couple's communication by permitting email communications pertaining only to Wendy, "and specifically her education and any medical issues." Moreover, the September Order permitted defendant to send only one email to Naomi per week, absent an emergency. Because the several emails defendant sent Naomi throughout December 2023 refer to the Beth Israel incident, discuss defendant's intention to drop off a gift for Wendy, and accuse Naomi of triggering defendant's PTSD, they were in direct violation of the content-based restrictions outlined in the September Order. As such, they establish the requisite intent to harass. The September Order assured Naomi that, absent an emergency, she would not be contacted by defendant more than once per week and the content of these communications would exclusively

9

pertain to Wendy's educational and medical needs. Despite the March Order providing him the ability to access information about Wendy via direct contact with her medical providers and through her school portal, defendant in his December 23, 2023 email threatened Naomi in stating "[d]on't you ever tell me to ask others for information on [Wendy]. I will ask you, and you will provide."

As the trial court found, this behavior demonstrates defendant as "demanding, imposing, agitated and controlling" and is buttressed by his past history with Naomi, specifically an instance described in Naomi's testimony, where defendant appeared at a post-divorce hearing wearing a shirt depicting a picture of Naomi, her new husband, and Wendy and sat next to Naomi and her husband while wearing the shirt. These instances provide a clear understanding of defendant's intentions and underscore the trial judge's finding that defendant's motivations were driven by his controlling nature to support a conclusion that defendant purposefully harassed Naomi to satisfy the first prong of Silver.

We conclude the trial court also correctly found an FRO is necessary to prevent further harassment with detailed findings regarding the statutory factors. Thus, we affirm the trial court's issuance of an FRO.

Finally, defendant raises several arguments contending he was deprived of a full and fair hearing, which he alleges also deprived him of due process. We are not persuaded.

In domestic-violence proceedings where a defendant faces the possibility of an FRO, "procedural due process requires trial judges, before trial, inform [the] defendant[] . . . both of the serious consequences resulting from the entry of an FRO and of their right to retain legal counsel." A.A.R. v. J.R.C., 471 N.J. Super. 584, 586 (App. Div. 2022). Although "due process does not require the appointment of counsel for indigent defendants in a domestic violence proceeding seeking an FRO[,] . . . . due process does require that a defendant understands that he or she has a right to retain legal counsel and receives a reasonable opportunity to retain an attorney." Id. at 588; see also D.N. v. K.M., 429 N.J. Super. 592, 607 (App. Div. 2013) (holding no due-process violation occurred when a plaintiff in a domestic-violence proceeding was unrepresented because she was informed of her right to seek counsel, that the defendant was represented, and what would result if an FRO was issued against the defendant).

Defendant alleges he was deprived of his fundamental due-process rights because he proceeded pro se—allegedly without adequate information as to the implications and without adequate time to prepare—after his initial trial counsel

11

notified the court he would no longer be working at the firm representing defendant. He also maintains he was left with "no choice" but to represent himself. These contentions are belied by the record.

Defendant was entitled to be informed before trial of the consequences of being issued an FRO. He was also entitled to be informed of the opportunity to be represented by counsel. See A.A.R., 471 N.J. Super. at 586. He was afforded both these rights because the trial court informed him of the consequences when scheduling trial and because he expressly waived representation by counsel after being questioned by the trial court when he appeared pro se. Regarding his waiver of representation, the following colloquy occurred:

> THE COURT: So I understand that [defendant's initial attorney] is no longer with . . . the firm that he was with and that you terminated the services of the firm, and you are now representing yourself; correct?
>
> [DEFENDANT]: Yeah, I had no choice but to make sure about move on [sic] properly. . .
>
> THE COURT: Well, you do have a choice. . . . [Y]ou have three choices.
>
> [DEFENDANT]: Oh.
>
> THE COURT: Right? So you have the right to represent yourself—
>
> [DEFENDANT]: Okay.

12

THE COURT: —which is what I understand that you're doing.

[DEFENDANT]: Yes.

. . . .

THE COURT: So you can get an attorney. If you feel that you can not [sic] afford a private attorney, there are legal services that can . . . assist you with doing that, and I know that this just happened as far as—I think it was Thursday or Friday that I . . . received the substitution of service, which is that form that you signed in thinking that [defendant's initial attorney] and his firm is [sic] no longer representing you and you're representing yourself.

. . . [S]o tell me again, when you say you have no choice. Go ahead.

[DEFENDANT]: Yes. I didn't have no choice [sic], because I had to start from ground zero with this new attorney—

THE COURT: Okay.

[DEFENDANT]: —that [defendant's initial attorney] is supposed to be keeping his boss informed of what's going on.

THE COURT: Okay.

[DEFENDANT]: I was told they don't have no meeting [sic] and they don't have no weekly updates [sic]. They don't have no monthly updates [sic].

THE COURT: Okay.

13

[DEFENDANT]: So I felt that I was more knowledged [sic] than the other person that's going to come on.

THE COURT: Okay.

As evidenced by his extended colloquy with the court, defendant knowingly and willingly proceeded without representation because he thought he could do a better job than substitute counsel. The record reflects he signed a substitution-of-counsel form acknowledging he was proceeding pro se. Defendant cannot now challenge his decision to proceed without representation merely because he received an adverse ruling. See D.N., 429 N.J. Super. at 607 ("[The plaintiff] denied the need to [retain counsel], believing hers was the stronger case. That her confidence was ill-founded is not a basis to conclude the court erred.").

To the extent we have not addressed any of defendant's remaining arguments, we are satisfied they lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2981-23